**PHARMACEUTICAL MANUFACTURERS ASSOCIATION et al.,**
Appellants,

v.

**John W. GARDNER, Secretary of Health, Education and Welfare et al.,**
Appellees.

No. 20541.

United States Court of Appeals District of Columbia Circuit.

Argued March 10, 1967.

Decided June 16, 1967.

Mr. Gerhard v. Gesell, Washington, D. C., with whom Messrs. Stanley L. Temko, Herbert Dym, Henry T. Rathbun and Lloyd N. Cutler, Washington, D. C., were on the brief, for appellants.

Mr. William W. Goodrich, Asst. Gen. Counsel, Dept. of Health, Education and Welfare, with whom Asst. Atty. Gen. Fred M. Vinson, Jr., and Messrs. David G. Bress, U. S. Atty., Frank Q. Nebeker and Joseph M. Hannon, Asst. U. S. Attys., and Mrs. Joanne S. Sisk, Atty., Dept. of Health, Education and Welfare, were on the brief, for appellees.

Before WRIGHT, McGOWAN and LEVENTHAL, Circuit Judges.

McGOWAN, Circuit Judge:

Appellants are a trade association and some of its individual members, interested in the manufacture of vitamin and mineral elements and the foods to which such elements are added. They sought declaratory and injunctive relief in the District Court against appellees, whose responsibility it is to administer the Federal Food, Drug, and Cosmetic Act, 52 Stat. 1040 (1938), as amended, 21 U.S.C. § 301 *et seq.* (1964). Their complaint was directed to the procedure followed by appellees in respect of certain regulations contemplated for issuance under the Act. The matter was heard in the District Court on cross-motions for summary judgment, and appellees' alternative motion to dismiss. It was the latter which prevailed. For the reasons appearing hereinafter, we do not disturb the judgment of the District Court adverse to appellants.

I

The statute immediately involved is Section 701(e) of the Act. It provides that the Secretary of Health, Education, and Welfare shall initiate any action relating to the issuance or alteration of regulations under the Act by publishing a proposal, as to which he "shall afford all interested persons an opportunity to present their views thereon, orally or in writing." Thereafter the Secretary "shall by order act upon such proposal"; and, for 30 days after the publication of such order, persons adversely affected by it may file objections "specifying with particularity the provisions of the order deemed objectionable, stating the grounds therefor, and requesting a public hearing upon such objections." The filing of

an objection automatically stays the effectiveness of the order in respect of the matter complained of; and, at the subsequent public hearing, evidence will be received and interested persons will be heard. After the hearing, the Secretary must act on the objections by an order "based only on substantial evidence of record" and "detailed findings of fact." Except for emergencies, the statute provides for a further 90-day delay in the effectiveness of the order, during which any aggrieved person may seek review of the order in a United States court of appeals.

Appellants point out that this statute appears to contemplate two stages in the exposure of an incipient regulation to public scrutiny. The first is the publication of a *proposal* and the receipt of comments upon it. The second is the promulgation of an *order*, and the receipt, hearing, and disposition of objections to it. Appellants insist that appellees have, in patent disregard of the Congressional command, omitted the first stage in this case; and that this entitles them to protective and corrective judicial intervention to require appellees, before proceeding further, to conform to the prescribed course. Appellees, although they question the legal propriety of a resort to the courts at this time in any event, also challenge the premise of appellants' claim for relief, asserting that there has in fact been no short-circuiting of the statutory scheme.

The origin of these conflicting inferences of fact is a proposal by the Secretary, published June 20, 1962, to revise the regulations relating to foods for special dietary use. This proposal recited in its preamble that the current regulations under Section 403(j) of the Act were in need of revision by reason of advances in the art since their promulgation more than twenty years before; and that "[I]n order to fulfill the purpose of Section 403(j), to prescribe by regulations, label information 'necessary in order fully to inform purchasers' of the value of such products for special dietary uses, major changes in the present regulations appear necessary." Section 403(j) was expressly—and exclusively—cited as the source of substantive statutory authority for the proposed regulations. The invitation to comment on the proposal evoked approximately 50,000 written submissions. Included among these were comments from most of the appellants.

The second stage of the Section 701(e) procedure opened on June 18, 1966, when the Secretary promulgated amended regulations. These were, on this occasion, in two parts. One was Part 125, designated as relating to "Food For Special Dietary Uses." Its preamble recited that the numerous comments received in respect of the 1962 proposal had been evaluated, and that "the regulations for food for special dietary uses should be revised as set forth below." Section 403 was specified as the underlying statute. The second and separately issued part was titled "PART 80—DIETARY SUPPLEMENTS AND VITAMIN AND MINERAL-FORTIFIED FOODS." Its preamble declared that "[I]n association with the revision of the regulations for foods for special dietary uses (21 CFR Part 125), published elsewhere in this issue of the FEDERAL REGISTER, which is acting on a notice of proposed rule making published in the FEDERAL REGISTER of June 20, 1962 (27 F.R. 5815), the Commissioner of Food and Drugs has concluded that definitions and standards of identity should be promulgated for dietary supplements and vitamin and mineral-fortified foods as set forth below." The statute cited as authority for Part 80 was Section 401.

Two weeks after the promulgation of Parts 125 and 80, the Secretary issued a regulation which purported to be "[I]nterpretations of orders relating to dietary supplements; vitamin and mineral-fortified foods; foods for special dietary use." It provided, among other things, as follows:

> (f) In the statement of authority for the issuance of Part 80, section 403(j) (52 Stat. 1048; 21 U.S.C. 343 (j)) was inadvertently omitted. That

section of the Federal Food, Drug, and Cosmetic Act, together with the prohibition against false and misleading claims and the general authority to issue regulations for the efficient enforcement of the act, are relied upon to support some provisions of Part 80.

Shortly after the promulgation of Part 80, appellant Association requested appellee Goddard to withdraw it on the ground that it had never been initially proposed as required by Section 701(e). When this proved unavailing, most of the appellants, including the Association, filed written objections as contemplated by the statutory second-stage provision and requested the evidentiary hearing assured them by the Act. Without awaiting a hearing of those objections, appellants went into the District Court seeking to enjoin such hearing and to procure a declaration of the nullity of Part 80 by reason of the allegedly omitted first stage.

The District Court rendered an oral opinion in which it noted that, although it was undisputed that a proposal was made in 1962, there was an apparent issue of fact between the parties "as to whether the order subsequently issued was broader than the original proposal." 259 F.Supp. 764. The Court opined, however, that this apparent factual issue became irrelevant in the light of the disposition it proposed to make, which was to grant the motion to dismiss. The Court said that it would be "improvident" for it to interfere with the progress of the rule-making proceeding, inasmuch as appellants would have a full opportunity to press their objections in the impending hearing, and to have judicial review of the result of that hearing. The currently fluid and indeterminate character of that result also suggested prematurity to the Court.

Appellants urge upon us that the District Court's rationale fails to come to grips with their grievance. Congress, they say, intended them, as well as appellees, to have the benefit of the first stage procedure. These benefits, they assert, include possible savings in cost through the elimination of the hearing which might prove unnecessary if appellees' response to first-stage comments resulted in abandonment or acceptable amelioration of the proposal. Costs apart, they say that there are values for all in the sifting and winnowing of issues and parties likely to characterize the first-stage process. In any event, they admonish, Congress is supreme in its power to prescribe the procedure to be followed in the implementation of regulation imposed by it. Where the prescription is clear, the administering agency may not ignore it without amenability to immediate judicial correction; and it is not for the courts to second-guess Congress on the essentiality of literal observance of the statute. Thus, we are told, the District Court should have intervened to restrain appellees from going ahead with the second stage of a procedure from which the first was missing.

## II

The District Court was, of course, entitled to take into account the nature of the relief requested in passing upon the invocation of its jurisdiction. That relief was of a declaratory and injunctive kind; and courts have traditionally scrutinized with care the occasions for the exercise of judicial power in these forms when the effect is to interfere with administrative processes.[1]

1. See 3 Davis, Administrative Law Treatise, c. 21 (1958); Jaffe, Judicial Control of Administrative Action, c. 10 (1965). Appellant's chief reliance is upon Leedom v. Kyne, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958), where the Court sustained an exercise of equity jurisdiction to correct an admittedly erring agency in advance of the completion of its processes. But there the opportunity for eventual redress of the statutory lapse was as uncertain as it was indirect, in contrast with the clear capacity of appellants here to preserve their complaint for a judicial scrutiny expressly provided by Congress. And the Court has subsequently warned that "[T]he *Kyne* excep-

These principles have recently been discussed by the Supreme Court in a group of cases involving the Act and some of the same parties as are involved here. Toilet Goods Ass'n v. Gardner, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697; Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681; Gardner v. Toilet Goods Ass'n, 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (all decided May 22, 1967). Their vitality is continuing, as evidenced by the first-mentioned case, in which the Court held that a suit in the District Court for declaratory and injunctive relief should be turned away. The regulation challenged, although finally promulgated, was not self-executing, and any attempt to apply it could be made the subject of an administrative hearing with ultimate judicial review of the result of such hearing. Under these circumstances, the Court thought that the resort to an equity court satisfied neither of the dual standards which must be met to sustain that jurisdiction, namely, "whether the issues tendered are appropriate for judicial resolution," and the degree of "the hardship to the parties if judicial relief is denied at that stage." 87 S.Ct. at 1523.[2]

Even if the first of these requirements be thought to be no barrier in the case before us, the situation in respect of the second is much less clear. It could be said here, for example, that although Congress has appeared to identify a two-stage procedure as mandatory, it has also provided explicitly for judicial review by the courts of appeals of claimed infirmities, procedural and substantive, in its administration. If appellees have erred in respect of the first stage, appellants have asserted as much in their statutory objections; and, although relief on this score is perhaps not to be expected from appellees, it could be forthcoming in the subsequent judicial review—if, that is, the regulation as it finally emerges is so unsatisfactory to appellants as to cause them to seek review. In other words, the failure to bring the judicial power to bear at this time arguably does not, under the Congressional scheme, mean that it will never be available to vindicate appellants' claim of a procedural deprivation.

Appellants deny that they will be made whole even if they succeed ultimately in persuading a court of appeals to invalidate the resulting regulation because of the absence of an initial proposal. They say that such a deferred triumph will not retrieve for them the cost of a hearing which, had the first stage been had, might never have been held at all by reason of the elimination of controversial issues. They urge that Congress clearly intended for them to have the benefit of this possibility; and that the only way it can be assured to them is for the courts to intervene at this point.[3]

tion is a narrow one * * *." Boire v. Greyhound Corp., 376 U.S. 473, 481, 84 S.Ct. 894, 899, 11 L.Ed.2d 849 (1964). Even where Congress has failed to make specific provision for direct judicial review of agency action, the Court has been wary of intrusion by the judicial branch into agency processes. See Brotherhood of Railway & Steamships Clerks v. Employees Ass'n, 380 U.S. 650, 85 S.Ct. 1192, 14 L.Ed.2d 133 (1965).

2. None of the three cases involved Section 701(e) of the Act. Each was concerned with pre-enforcement injunctive and declaratory relief in respect of regulations finally issued under other sections of the Act. In the two cases where the Court thought that District Court jurisdiction attached, the Court found serious hardship to the plaintiffs if they were denied judicial scrutiny of the regulations prior to their enforcement.

3. The Supreme Court had occasion, in Abbott Laboratories v. Gardner, to examine the savings clause in Section 701(f) (6), which provides that "[T]he remedies provided for in this subsection shall be in addition to and not in substitution for any other remedies provided by law." The majority regarded this clause as having a force independent of the context of Section 701(f) in which it is contained and which is addressed primarily to the court of appeals review relevant to the instant case. The majority noted that the Government had argued in *Abbott* that the savings clause is to be taken "as applying only when regulations falling within the special review procedure are promulgated without affording the

We are by no means as certain that Congress conceived of the first stage as being of such critical significance to persons situated as appellants seem to be on this record. Appellants do not pretend that their differences with appellees over the proposed regulations are other than fundamental and deep-seated. One need not be an expert to get the impression that these differences were not likely to disappear through the winnowing effects of first-stage comments, as indeed they seem not to have done. The legislative history of the two-stage procedure appears to us to reflect, above all, a purpose to eliminate, by means of the first stage, evidentiary hearings where regulations as initially proposed were so devoid of controversial aspects as to evoke no fundamental objections.

The present procedure first was incorporated into the Act by a 1954 amendment which applied only to proceedings under Section 401. The Senate Report stated:

> The consensus of opinion among all the leading food producers, as well as Food and Drug Administration officials, is that the existing standard-making procedures are slow and cumbersome. The procedural requirements of the present law are unnecessarily burdensome in that they require formal hearings and all that this implies, whether a proposed regulation is controversial or not, with the resultant useless expenditure of time and money by both the Government and the interested industry, even when all are in agreement as to the proposed regulation. Enactment of this bill would provide needed relief from these unnecessary burdens by eliminating the requirement for formal hearings except in instances where such a hearing is desired for the purpose of providing a basis for the judicial review as now provided in the act, should the objecting party find the ultimate regulation still objectionable.

S.Rep. No. 1060, 83rd Cong., 2d Sess. 1–2 (1954) U.S.Code Congressional and Administrative News, p. 2126.

In Senate debate on the bill, Senator Purtell reiterated that "the main purpose of the bill is to facilitate the making of noncontroversial changes in the food standard regulations * * * by restricting the requirements for the formal type hearings, as prescribed in section 701(e) of that act, to instances where this procedure is desired by a party who would be adversely affected if the regulation, as proposed, were effective." 100 CONG.REC. 4556 (1954).

In 1956 it was decided to extend the two-stage proceeding to rulemaking under sections of the Act other than section 371, to which application of the 1954 amendment had been limited, in light of the fact that "experience under [that amendment] has been so gratifying to both industry and government that all concerned desire to have this simplified procedure apply to all regulatory procedures referred to in section 701 of the Federal Food, Drug, and Cosmetic Act." S.REP. No. 2752, 84th Cong., 2d Sess. 1 (1956) U.S.Code Congressional and Administrative News, p. 4104. The purpose of the bill was identical to that of the 1954 amendment: to "remove in specified situations, where the proposed regulations are not controversial, the mandatory requirement of following formal rule-making procedures." *Ibid.* In letters from the Secretary of H.E.W. and the Executive Office of the President, arguments similar to those employed in 1954 were relied upon by the Congress and appended to the Senate Report. The former stated that

required public notice and opportunity to file objections and to request a public hearing. In such a case alone, the Government asserts, 'An equity proceeding or declaratory judgment action * * * might be entertained on the ground that the statutory procedures had not been followed.'" 87 S.Ct. at 1514 n. 14. Appellants presumably would regard this position as highly congenial *vis-à-vis* their own in the present appeal.

> [t]his bill would extend the procedural simplification provisions of [the 1954 amendment] by removing the requirements of formal rulemaking—public hearing, and establishment of a record of testimony and exhibits on which to base a decision—with respect to certain regulations in cases where the regulation, or amendment or repeal of the regulation, is noncontroversial. The regulations concerned are those dealing with labeling for special dietary foods (sec. 403(j)) * * *. The bill would greatly facilitate the establishment of regulations insofar as they are noncontroversial. It would also simplify hearings on regulations containing both controversial and noncontroversial issues by separating and eliminating the noncontroversial. * * * [N]o substantial rights of any person would be relieved of protection, while government, the public, and industry are relieved of the costs and expenditure of time in holding hearings on points about which all agree.

*Id.* at 2–3. The latter noted that "Under this simplified procedure the holding of a hearing prior to the making or changing of a rule is eliminated as a condition precedent to rulemaking, when the proposed rule is not in controversy." *Id.* at 4.

The legislative history suggests that what Congress had in mind when it enacted the two-stage procedure was the paramount consideration of expediting new regulations over which there would be no controversy. In such expediting there would, of course, be savings of time and expense for all concerned, but the constant refrain was that such savings would occur only when the proposals were not controversial. It was not assumed that the winnowing process —the narrowing and sharpening of issues—would have any significant role to play in the first stage with respect to issues of a controversial nature.[4] Where, as here, almost every significant aspect of the proposed regulations has been objected to, the proposal stage of the proceedings would have been thought by its framers to be of dubious value in eliminating the need for evidentiary hearings.

Thus, even assuming a default by appellees in omitting the first stage, it is by no means clear that Congress would have regarded that failure in this case as warranting judicial interference with the impending evidentiary hearing. It was this last which Congress regarded as critical in the controversial areas— and no one pretends that this record is concerned with any other. We do not say that wise and prudent administration of the Act would encompass disregard by appellees of the first stage whenever they believe it to be fruitless, but we are addressing ourselves here to the disposition of a lawsuit and not to the quality of the intra-departmental administrative performance. In considering the urgency of appellants' need

4. Appellants referred in oral argument to the excerpt from the legislative history of the Fair Packaging and Labeling Act quoted at page 14, footnote 4, of their brief, as supporting their concept of the importance attached by Congress to the shifting effects of the first stage. The House Report of that Act stated in explanation of the fact that issuance of regulations would be subject to the procedures set out in the Food, Drug, and Cosmetic Act under consideration here:

> These provisions require that notice of proposed rulemaking be published in the Federal Register with an opportunity for all interested persons to file comments and suggestions. *After that step has been completed,* the promulgating authority may issue the regulations, in which event it must allow 30 days for the filing of objections by persons who will be adversely affected. *These objections* have the effect of narrowing and sharpening any issues that may remain in controversy and provide the basis for public hearings.

H.R.Rep. No. 2076, 89th Cong., 2d Sess. 13 U.S.Code Congressional and Administrative News, p. 4069 (1966) (emphasis added). The objections referred to in the final sentence are, of course, objections filed to regulations promulgated as orders in the second stage of the proceedings.

for the interposition of the equity power, the District Court was justified in conceiving of that need as less than completely compelling. Certainly that intrusion is normally to be confined to cases which cry out for the erection of equitable barriers to an administrative tyranny from which there is no prospect of relief. Short of that, the effective realization by Congress of its regulatory objectives through its chosen machinery is not lightly to be impaired by putting the restraining hand of the courts upon that machinery while it is in operation.

III

We do not, however, rest our affirmance upon this prudential approach to the availability of equitable jurisdiction, because we believe there is sufficient substance in appellees' insistence that they did not in fact ignore the first-stage procedure. They assert that, had the District Court gone on to explore this pretermitted issue of fact, it would have had no occasion to consider its jurisdiction to notice a statutory lapse by appellees since there was no failure by them in this respect. They argue vigorously that the 1962 proposal embraced the essence of Part 80, and that the 1966 formulation was within the tolerances for revision and alteration implicit in the two-stage procedure.

In turning to this question of fact,[5] we do not lose sight of the ultimate issue we have to decide, namely, the propriety of a denial of equitable relief. That kind of determination does not depend upon pure blackness or whiteness in the ordering of the facts. It admits of some degree of grayness in the shadings that finally emerge. This is because the final question remains that of whether appellants, under all the circumstances, have shown a need for this extraordinary invocation of judicial authority. Applying this measure to appellees' alleged disregard of the statute, we think appellants are short of the mark.

It is generally urged upon us by appellants that, whereas the 1962 proposal purported to be concerned only with accuracy and completeness in the label description of a product, Part 80 in 1966 addressed itself to control of the contents. Thus it is said that Part 80, since it is different in kind—and not only in degree—from the initial proposal, cannot be regarded as simply a revision or alteration of it. We, however, cannot conclude from the record that the 1962 proposal was so devoid of limiting effects with respect to what could go into a product. And our own conclusion in this respect is perhaps most strongly buttressed by the circumstance that this very point was vigorously made by many of the appellants in their written first-stage comments.

The 1962 proposal was in form a proposal to revise the existing dietary food regulations which were then made up of Sections 125.1 through 125.9 of Part 125. As revised, the number of sections was enlarged by the addition of 125.10 through 125.12. Section 125.10 was entitled "Label statements relating to food supplements or dietary supplements"; and its effect was characterized as follows in the written comments made by appellant Merck & Company:

> Section 125.10, issued under Section 403(j), will operate in practice to specify the particular constituents that may lawfully be used in vitamin and mineral preparations and to define, within given ranges, the amounts of these constituents that may be used. In addition, it will serve to exclude certain constituents heretofore used in such preparations from use in the future. The nutrients excluded by Section 125.10 could not be included at all in special dietary food supple-

5. Although the District Court did not pass upon this question of fact, at oral argument of this appeal appellants represented that all of the factual information pertinent to this finding was contained in the affidavits which are part of the record on this appeal; and both parties requested us, if we reached the issue, to pass upon it without remanding it for exploration by the District Court.

ments. This result would follow necessarily from the interaction between Section 125.10 of the proposed regulations and Section 403(i) of the Act. Section 403(i) requires that the name of *each* ingredient must be shown on the label, and Section 125.10 would require that the label shall bear *only* references to the specific nutrients listed in the regulation. Therefore, all nutrients not among the twelve specified in Section 125.10 could not be listed on the label, and since Section 403(i) requires that *all* ingredients be listed on labels, these nutrients *could not be used* at all in special dietary food supplements.

This view of 125.10 was echoed in the submissions made by other appellants. Atlas Chemical said of 125.10 that "the principle of attempting in these regulations to restrict the number of nutrients is unsound as is the principle of attempting to place lower and upper limits on the nutrients" which are permitted to be used. Chas. Pfizer & Co., Inc. protestingly referred to 125.10 as proposing "to dictate which safe nutrients shall be permitted and which shall be excluded." The Upjohn Company urged "that the limitations on the use and amount of nutrients imposed by Section 125.10 be removed" for scientific as well as legal reasons. The Pharmaceutical Manufacturers Association declared that "without any objective supporting evidence, the Commissioner now, in effect, is stating, through the proposed new regulations, that purchasers cannot be fully informed if the labels of foods for special dietary uses declare nutrients other than the amounts and those authorized by Section 125.10."

To the extent that a Congressional purpose in the two-stage procedure was to cause the initial proposal to give notice of, and the opportunity to comment upon, controversial proposals for regulations, there is no doubt from this record that the 1962 proposal gave appellants just that. Nor is there any doubt from their lengthy written comments that they saw appellees as seeking control over the contents of special food supplements. Appellants addressed themselves, vigorously and in detail, to the legality of this control as well as to its scientific merits. On the basis of the representations so made, it would appear fanciful to suppose that, unless this proposal of control was substantially abandoned, it would not be put to the test of the evidentiary second-stage hearings and ultimately, of judicial review.

Appellees did not abandon 125.10. Instead, when the second stage was initiated by the orders entered in 1966, 125.10 was revised in many ways, was removed from Part 125 dealing with food for special dietary uses, and was embodied in Part 80 under the heading of "Dietary Supplements and Vitamin and Mineral-Fortified Foods." The record shows that some or all of appellants have filed formal objections in respect of both Part 80 and Part 125, and have requested hearings on those objections. In the case of Part 80, these objections go to the scientific merits of certain aspects of the proposed regulations, as well as to the general authority of appellees under the Act to exert this kind of control at all.

We are unable to say, at least upon this record, that the provisions of Part 80, as formulated in 1966, are so different from 125.10, as proposed in 1962, as to lack any first-stage foundation. It is certain that the centrally important differentiation between regulating labels, as distinct from controlling contents, was plainly apparent in 1962, as appellants were quick to point out. Part 80 differs, of course, in many respects from the earlier proposal, but these differences do not consist in the assertion by appellees for the first time of a purpose to regulate the make-up of dietary supplements. We would be blinking reality if we failed to sense that this is the overshadowing question on which appellants have joined issue with appellees, and one which will be thoroughly ventilated in the course of the administrative and judicial proceedings provided by Congress subsequent to the first

stage. All we say now is that the 1962 proposal sufficiently foreshadowed Part 80 as to make it unnecessary for an equity court to block these further proceedings.

We turn last to the matter of the citation of statutory authority for the 1962 proposal. The authority so cited was admittedly confined to Section 403(j). Appellants insist that, since this is limited to control of labelling, it cannot support a proposal which also involves control of contents. We may defer to this insistence for present purposes, as appellees appear to have done when they acted to amend Part 80 promptly to make clear that both Section 401 and Section 403(j) were looked to as sources of authority for the various provisions of Part 80. But the acceptance of this proposition does not compel the conclusion that the 1962 proposal is unavailing to stay the exercise of equity jurisdiction in this case.

Appellants seem to put the omission of Section 401 in 1962 to two uses. One is to contend that its omission shows that there was no intention—or at least no revealed intention—by appellees to regulate contents by anything comprised in the 1962 proposal. But what has been said above about the language of 125.10 and appellants' explicit and emphatic responses to it indicates that the failure to cite the relevant statute did not operate either to veil appellee's intentions or to demonstrate that no such intentions existed.

The second, and more sustained, effort by appellants is to establish that the failure to cite Section 401 in the 1962 proposal rendered that proposal a legal nullity insofar as Part 80 is concerned, wholly apart from whatever notice it may have conveyed in fact. Without stopping to inquire whether such a separation of fact from theory is characteristic of an equity court,[6] we note first that there is nothing in Section 701(e) of the Act—the statute creating the two-stage procedure—which commands the citation of statutory authority, either in the first-stage proposal or the second-stage order. We do not thereby conclude that appellees could complete a rule-making proceeding of the special kind envisaged by Section 701(e) without giving appropriate notice of the authority relied upon. The Administrative Procedure Act would appear to prevent that. But the requirements of that statute were formulated with one-stage proceedings as the norm; and the Congressional objectives underlying those requirements would not seem to us to compel their rigid application to a first-stage proposal which, under the admittedly unique procedures of this statute, will not ripen into a rule until there has been a second-stage publication of a proposed rule in respect of which objections will be entertained and disposed of after an evidentiary hearing.[7] Those who fought the battle to establish the notice requirements for rule-making

6. This court has recently taken note, in the review by it of final agency action, of the relevance of the harmless error principle. See Braniff Airways v. C.A.B., 126 U.S.App.D.C. —, 379 F.2d 453 (decided April 12, 1967), in which we said:

> The Supreme Court's opinions reflect the concern that agencies not be reversed for error that is not prejudicial. Thus the Court refused to upset an order referring to the wrong statute, when the error had no bearing as to the relevant criteria or procedure. The principle of SEC v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), does not mechanically compel reversal "when a mistake of the administrative body is one that clearly had no bearing on the procedure used or the substance of decision reached." Massachusetts Trustees v. United States, 377 U.S. 235, 248, 84 S.Ct. 1236, 12 L.Ed.2d 268 (1964).

7. Appellants have been at great pains to impress upon us the "uniqueness" of the two-stage procedure embodied in Section 701(e). This could account for the failure of the APA to accommodate its provisions precisely to this distinctive approach to rulemaking. The second stage of Section 701(e) embraces every aspect of notice which the APA deemed of importance; and, in addition, it provides an evidentiary hearing.

would, we think, be singularly unmoved by the claim made here that an omission to designate statutory authority in the first-stage proposal here should render its citation in the second-stage order ineffective to give a notice commensurate with the goals of the APA. There is no question but that the 1966 order of publication of Part 80 is in compliance with the statutory authority aspect of Section 4; and that, in our view, is enough to remove the APA as a reason why the District Court should restrain the further progress of Section 701(e) proceedings.

 One need not feel that the record reveals a model of sure-footed administrative performance in order to conclude that appellants do not presently require judicial protection against the continuance of this administrative proceeding. The courts sit to assure substantial fairness, not to discipline agencies for awkwardness in their staff work. The adherence by appellees to the Congressional scheme might have been smoother in execution, but adherence we think there was, at least of such substantiality as to relieve the District Court of any duty to give appellants the relief they sought.

The judgment of the District Court is Affirmed.

J. SKELLY WRIGHT, Circuit Judge (concurring):

I concur in Judge McGowan's excellent opinion. I would, however, hold that judicial intervention at this stage in the administrative process is impermissible since appellants have failed to exhaust their administrative remedies. Brotherhood of Railway and Steamship Clerks, etc. v. Ass'n for Benefit of Non-Contract Employees, 380 U.S. 650, 85 S.Ct. 1192, 14 L.Ed.2d 133 (1965); Boire v. Greyhound Corp., 376 U.S. 473, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964); Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638 (1938). *Compare* Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); Gardner v. Toilet Goods Ass'n, 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967); Toilet Goods Ass'n v. Gardner, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967); Leedom v. Kyne, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958).