**PACTRA INDUSTRIES, INC., Petitioner,**

**v.**

**CONSUMER PRODUCT SAFETY COMMISSION, Respondent,**

**DAP, Inc., Intervenor,**

**Sprayon Products, Inc., Intervenor.**

**Nos. 74-2902, 74-3168.**

United States Court of Appeals, Ninth Circuit.

May 2, 1977.

As Amended June 13, 1977.

Joel E. Hoffman, argued, Anthony L. Young, Wald, Harkrader & Ross, Washington, D. C., for petitioner.

Gregory B. Hovendon, Chief Consumer Affairs Section, John R. Fleder, argued, Antitrust Div., Dept. of Justice, Washington, D. C., for respondent.

Before BARNES, CHOY and KENNEDY, Circuit Judges.

KENNEDY, Circuit Judge:

This case requires an examination of the statutory authority of the Consumer Products Safety Commission (the Commission) to issue regulations under section 701(e) of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 371(e), without first holding public hearings. Pactra Industries, Inc. (Pactra) petitions for review of an order of the Commission promulgating a regulation that classifies all self-pressurized products intended or suitable for household use and containing vinyl chloride monomer as "banned hazardous substances" and that requires the repurchase of all existing quantities of those articles.[1]

---

1. Sprayon Products, Inc. and DAP, Inc. were granted leave to intervene in this petition. The objections and the requests for a hearing filed by Pactra provide sufficient bases for disposing of this case, and we need not specifically address the objections raised by intervenors Sprayon and DAP.

The Commission's order and regulation are predicated on the Federal Hazardous Substances Act, 15 U.S.C. §§ 1261–1274.[2] The act defines "hazardous substance[s]" to include certain toxic, corrosive, irritating, sensitizing, flammable, pressure generating, or radioactive materials which may cause substantial illness or injury as a proximate result of foreseeable use. 15 U.S.C. §§ 1261(f)(1)(A), (B) & (C). The Commission is authorized to adopt regulations declaring specific items to be hazardous substances. *Id.* § 1262(a).[3] Hazardous substances are subject to various inspection and record-keeping requirements, *id.* §§ 1270, 1271, and, if not labeled in accordance with the statute, are defined as "misbranded hazardous substances." *Id.* § 1261(p). The Commission may also adopt regulations declaring specific items to be "*banned* hazardous substances" where, notwithstanding cautionary labeling,

> the degree or nature of the hazard involved in the presence or use of such substance[s] in households is such that the objective of the protection of the public health and safety can be adequately served only by keeping such substance[s], when so intended or packaged, out of the channels of interstate commerce
>
> . . . .

*Id.* § 1261(q)(1). This substantive provision is the foundation of the Commission's regulation in this case.

In issuing an order or regulation that declares a product a hazardous substance or banned hazardous substance, the Commission must follow the procedures mandated by the Federal Food, Drug and Cosmetic Act, § 701(e), 21 U.S.C. § 371(e). *See* 15 U.S.C. §§ 1261(q)(2), 1262(a)(2). Section 371(e) contemplates a one or two-stage rulemaking procedure, depending on whether objections are filed by persons adversely affected by the Commission's action. At the first stage, the Commission publishes a proposed regulation, and interested persons may present their views thereon. As soon as practicable thereafter, the Commission then acts on the proposal and publishes its order. A second stage is reached if, on or before the thirtieth day after publication of the order, any person adversely affected files objections "specifying with particularity the provisions of the order deemed objectionable, stating the grounds therefor, and requesting a public hearing upon such objections." 21 U.S.C. § 371(e)(2). The filing of objections operates to stay the provisions of the Commission's order that are drawn in question. The statute then requires a public hearing "for the purpose of receiving evidence relevant and material to the issues raised by" the objections, 21 U.S.C. § 371(e)(3), and further mandates as follows:

> As soon as practicable after completion of the hearing, the [Commission] shall by order act upon such objections and make such order public. Such order shall be based only on substantial evidence of record at such hearing and shall set forth, as part of the order, detailed findings of fact on which the order is based.

*Id.* Any person adversely affected by a regulation promulgated under section 371(e) may file a petition for review with the United States Court of Appeals. 21 U.S.C. § 371(f)(1).[4]

---

2. Three statutes designed to protect consumers from dangerous products constitute the backdrop of this case. The substantive provisions administered by the agency are contained in the Federal Hazardous Substances Act, 15 U.S.C. §§ 1261(q), 1274. That statute incorporates by reference procedures of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 371(e), (f), (g). 15 U.S.C. § 1262. The Hazardous Substances Act was originally administered by the Secretary of Health, Education and Welfare, but those functions were transferred to the Consumer Product Safety Commission by the Consumer Product Safety Act of 1972, 15 U.S.C. § 2079(a). The Commis-

sion administers other substantive statutes of extensive coverage under procedures different from those discussed in this opinion. *See* 15 U.S.C. § 2079.

3. The Act specifically excludes certain fuels, pesticides, foods, drugs, cosmetics, and nuclear materials, which are subject to regulation under other statutes. 15 U.S.C. § 1261(f)(2), (3).

4. Perhaps incongruously, the statute provides a different standard of review for regulations that classify "hazardous substances." The standard of review is "fair evaluation of the

For some years, vinyl chloride commonly served as a propellant in aerosol cans manufactured to dispense paints, cosmetics, and other household products. Pactra, which manufactures and sells aerosol spray cans, at one time employed vinyl chloride as a propellant in its small cans of hobby paint. In 1974, a sharp increase in the cost of vinyl chloride caused Pactra and many aerosol can manufacturers to stop using that propellant, but many of the cans containing vinyl chloride still remain in the chain of distribution.

In early 1974, the B. F. Goodrich Company reported to the National Institute of Health that since 1971, three of its employees who had been exposed to vinyl chloride at an industrial plant for approximately nineteen years had died from angiosarcoma of the liver, a rare form of cancer. Laboratory studies on animals who were administered varying dosages of vinyl chloride over extended periods further suggested that the chemical may be carcinogenic. As a result of this evidence, a number of federal agencies sought to protect industrial workers and the general public from exposure to vinyl chloride.[5]

In May 1974, the Commission acted to ban the propellant. The Commission began the administrative process here at issue by publishing a proposed regulation banning all "self-pressurized products intended for household use that contain[ed] vinyl chloride monomer." 39 Fed.Reg. 18115, 18116 (1974). In proposing its regulation, the Commission referred both to the report mentioned above linking the death of industrial workers from angiosarcoma of the liver to vinyl chloride exposure, and to certain laboratory experiments conducted in a European university. Interested persons were invited to submit written comments on the proposed regulation.

The Commission received nine comments on the proposed order. Three of the comments criticized the ban. These comments noted that household users of the spray cans were exposed to only limited amounts of vinyl chloride and that there was no evidence that such limited exposure was hazardous. They urged the Commission to implement its regulation only prospectively on the ground that there was little likelihood of harm from use of existing stocks. After considering these comments and examining other information, including testimony presented at hearings conducted by other federal agencies, 39 Fed.Reg. 30112 (1974), the Commission promulgated its order classifying as "banned hazardous substances" all aerosol products containing vinyl chloride and intended or suitable for household use. 16 C.F.R. § 1500.17(a)(10) (1977). In support of its order, the Commission stated that no safe level of human exposure to vinyl chloride has been established. 39 Fed.Reg. at 30113. It stated that it did not regard the health hazard posed by the use of such products to be speculative or minimal, and it declined to give its order only prospective application. It concluded that "the potential hazard . . . is sufficiently serious and immediate to warrant repurchase . . . ." *Id.*

entire record," 15 U.S.C. § 1262(a)(2), *incorporating* 21 U.S.C. §§ 348(f)(2), (g)(2)(4), (g)(3), which allows a broader scope of judicial review than the "substantial evidence" test specified in 21 U.S.C. § 371(f)(3). *See* S.Rep.No. 2422, 85th Cong., 2d Sess., *reprinted in* [1958] U.S. Code Cong. & Ad.News, pp. 5300, 5306–07.

5. On April 5, 1974, the Occupational Safety and Health Administration published an Emergency Temporary Standard setting an occupational exposure limit to vinyl chloride. 39 Fed.Reg. 12342 (1974). For later agency action, *see* 39 Fed.Reg. 16896 (1974) and 29 C.F.R. § 1910.-1017 (1976).

On April 22, 1974, the Food and Drug Administration published a notice of proposed rulemaking concerning vinyl chloride used as an ingredient in drug and cosmetic aerosol products. 39 Fed.Reg. 14215 (1974). *See* 21 C.F.R. §§ 310.506 & 700.14 (1976).

On April 26, 1974, the Environmental Protection Agency published a notice of emergency suspension of, and a notice to cancel the registration, under the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. §§ 135–136y, of all pesticide spray products containing vinyl chloride that are used in the home, in food handling establishments, in hospitals, or in enclosed areas. 39 Fed.Reg. 14753 (1974). The registration of a number of pesticides was subsequently cancelled. *See* 40 Fed.Reg. 3494 (1975).

In response to the Commission's order, Pactra submitted timely cbjections under 21 U.S.C. § 371(e)(2) and requested a hearing. The company took exception to certain studies mentioned by the Commission and stated that the Commission's published explanation failed to mention facts that militated against its conclusion.[6] Contending that the information cited by the Commission dealt solely with the effects of vinyl chloride in high intensity and long-term industrial patterns of use, Pactra asserted that the data failed to establish the conditions of customary use for the products at issue. It claimed that the risk of cancer stemming from foreseeable use of household paint products could not be extrapolated from data relating to occupational exposure. The company alleged that there was no evidence that the level of exposure resulting from the use of aerosol spray paints was harmful to humans and that the Commission had not shown why banning those products was necessary in order to protect the public health.

Pactra argues that under 21 U.S.C. § 371(e) these objections required the Commission to hold public hearings, make details of finding of fact, and support any new regulation by substantial evidence in the record—in short, Pactra asserts that the Commission was bound to proceed to the second stage of the rule-making process under 21 U.S.C. § 371(e). The Commission declined to reach this second stage. It issued an order denying a public hearing and stated:

The objections are practically void [sic] of any references to, or offers to present, factual information which the Commission believes would lead to a conclusion contrary to that reached by it. Such information as has been referred to, even if true, is not legally sufficient to invalidate the ban order.

39 Fed.Reg. 36576, 36577 (1974). Commenting on the hearing requirement of section 371(e), the order noted:

The section [371(e)] hearing was not placed in the statute so that parties regulated by agency action can require the agency to present evidence, more evidence, and still more evidence until the affected parties are finally satisfied that enough evidence has been presented. Whether the Commission's conclusions are reasonable cannot be resolved by an evidentiary hearing.

Id. Pactra then filed the instant petition for review of the Commission's order.

As authority for denying a hearing to Pactra, the Commission cites its own regulation providing that a hearing under section 371(e) will be denied where objections filed do not state reasonable grounds. 16 C.F.R. § 1500.201(b) (1977). Reasonable grounds are defined as "grounds from which it is reasonable to conclude that facts can be established by reliable evidence at the hearing which will call for changing the provisions specified in the objections." Id.

---

**6.** The objections and the request for a hearing and the supporting memorandum filed by Pactra dispute, for example, the statistical and scientific validity of tests consisting of exposure of laboratory mice to an atmosphere consisting of 50 parts per million of vinyl chloride monomer for extended periods of time. Pactra noted that the Environmental Protection Agency, in commenting on one such test, had stated: "The significance of these figures is still not fully understood because data on the deaths in the control group of mice has not yet been fully analyzed." 39 Fed.Reg. 14753 (1974). The company also challenged a test purporting to show that the release of an insect spray containing vinyl chloride for thirty seconds into a 21,400 liter room created concentrations of vinyl chloride as high as 400 parts per million. Pactra questioned the validity of the Commission's reliance on that test as the basis for extrapolating the ambient level of vinyl chloride resulting from the customary use of the products at issue. Pactra further sought to explore a statement in the briefing papers of the Commission's Office of Coordination and Appraisal to the effect that "there [was] no specific evidence that the concentration and frequencies of exposure to vinyl chloride from aerosolized consumer products is causally related to development of angiosarcoma of the liver in humans." Pactra also cited internal memoranda of the Commission tending to show that the recommendation to ban the products at issue was based on the theory that the actions of other agencies under other statutes justified the ban "for the sake of consistency of policy and consumer confidence."

The Commission contends that this regulation properly implements the hearing requirement of section 371(e).

In support of its determination to invoke its regulations to bypass the hearing and record-making procedures prescribed by statute, the Commission cites *Dyestuffs and Chemicals, Inc. v. Flemming*, 271 F.2d 281 (8th Cir. 1959), where the Court of Appeals for the Eighth Circuit stated:

[T]he objections, in order to be effective and necessitate the hearing requested, must be legally adequate so that, if true, the order complained of could not prevail. The objections must raise "issues". The issues must be material to the question involved; that is, the legality of the order attacked. They may not be frivolous or inconsequential. Where the objections stated and the issues raised thereby are, even if true, legally insufficient, their effect is a nullity and no objections have been stated.

*Id.* at 286.[7]

Relying on *Dyestuffs,* the Commission argues that Pactra's objections and factual contentions, even if true, fail on their face to require a change of the Commission's order, and that it therefore properly denied Pactra's request for a hearing.

Congress has gradually curtailed the instances in which hearings must be held before an agency promulgates regulations under § 371(e). But from the time of the statute's inception the requirement of a formal hearing has remained a principal feature of the statutory scheme where a controversial regulation is involved, and its requirement has been retained each time the act has been amended.

As enacted in 1938, the predecessor of section 371(e) required hearings on every proposal initiated by the Secretary to issue, amend, or repeal a regulation under specified provisions of the Federal Food, Drug and Cosmetic Act. Act of June 25, 1938, ch. 675 § 701(e), 52 Stat. 1055 (current version at 21 U.S.C. § 371(e)).[8] A review of the committee reports and the floor debates that preceded the promulgation of the Act establishes that the drafters of the legislation considered public hearings on rule proposals to be an essential procedure, and that they intended the broad grant of power given to the administrative body by the statute to be checked by judicial review based only on the record compiled at the public hearings. H.R.Rep.No. 2139, 75th Cong., 3d Sess. (1938), *reprinted in* C. Dunn, Federal Food, Drug and Cosmetic Act 824 (1938). *See also* 83 Cong.Rec. 7892, 7898 (1938) (remarks of Representative Lea), *reprinted in* C. Dunn, *supra,* at 949–50; 83 Cong.Rec. 7773, 7776 (1938) (remarks of Representative Lea), *reprinted in* C. Dunn, *supra,* at 851–52.

---

**7.** In *Dyestuffs* the Deputy Commissioner of Food and Drugs had ordered certain food colors derived from coal tars deleted from the list of approved food color additives on the ground that they were not harmless under section 406(b) of the Federal Food, Drug and Cosmetic Act, ch. 675, § 406(b), 52 Stat. 1049 (1938) (repealed 1960). The exercise of regulatory power under section 406(b) was governed by the same statute that is controlling here, 21 U.S.C. § 371(e). The petitioner, Dyestuffs and Chemicals, Inc., filed objections to the order and requested a hearing under section 371(e)(2). The petitioner did not deny that the color tars were harmful under some circumstances. It argued, in substance, that the colors were harmless under their intended conditions of use. After the objections were filed, but before any hearing was held, the Supreme Court issued its opinion in *Flemming v. Florida Citrus Exchange,* 358 U.S. 153, 79 S.Ct. 160, 3 L.Ed.2d 188 (1958). The Court, interpreting section 406, held that "where a coal-tar color is not harmless, it is not to be certified," *id.* at 168, 79 S.Ct. at 168, and therefore that the agency was "without power to permit the use of harmful coal-tar colors in specific foods through a system of tolerances." *Id.* at 167, 79 S.Ct. at 168. The Food and Drug Administration interpreted the decision as rendering Dyestuffs' objections moot. It denied the request for a hearing, stating that the objections were "without substance, and no purpose could be served by holding a public hearing." *Dyestuffs & Chemicals, Inc. v. Flemming,* 271 F.2d at 283. The Eighth Circuit affirmed.

**8.** For the legislative history of section 371(e), see generally, C. Dunn, Federal Food, Drug and Cosmetic Act (1938); Forte, *Fair Hearing in Administrative Rule-Making: A recent Experience under the Federal Food, Drug, and Cosmetic and Fair Packaging and Labeling Acts,* 1968 Duke L.J. 1.

■ In the decade following the promulgation of the 1938 Act, it became apparent that the requirement of public hearings was unnecessarily cumbersome: it applied to every rule-making proposal by the Secretary, whether controversial or not. This resulted in "useless expenditure of time and money by both the government and the interested industry, even when all [were] in agreement as to the proposed regulation." *See* S.Rep.No. 1060, H.R.Rep.No. 934, 83d Cong., 2d Sess., *reprinted in* [1954] U.S.Code Cong. & Ad.News, p. 2126. Accordingly, Congress amended the rule-making procedure in 1954 as it pertained to regulation of definitions and standards for food under section 401 of the Act. Pub.L.No. 335, ch. 143, 68 Stat. 54 (1954). In 1956, the new procedures were made applicable to rule making under other sections. Pub.L.No. 905, ch. 861, 70 Stat. 919 (1956). At that time 21 U.S.C. § 371(e) was enacted in its present form. The 1954 and 1956 amendments enacted the notice and comment procedure that constitutes the first tier of section 371(e)'s procedural framework. By these amendments Congress provided a means for the agency to minimize at the outset unnecessary controversy about proposed regulations by permitting affected parties and the agency to compromise in advance of hearings and to delimit with precision any remaining differences. The legislative history of those enactments demonstrates that Congress fully intended that the rigid statutory requirement of a formal hearing should continue in every case where a proposed regulation was controversial and opposed by persons who were adversely affected by the agency's action.[9] The second stage requirement of formal hearings was regarded as a critical safeguard. *Pharmaceutical Manufacturers Association v. Gardner,* 127 U.S.App.D.C. 103, 381 F.2d 271, 278 (1967).

The significance of the hearing requirement is highlighted by another aspect of the legislative history. Section 371(e) in its amended form was patterned after 21 U.S.C. § 357(f). *See* Letter from Secretary of Health, Education, and Welfare to Hon. H. Alexander Smith, Chairman of the Committee of Labor and Public Welfare, *incorporated in* S.Rep.No. 1060, 83d Cong., 2d Sess., *reprinted in* [1954] U.S.Code Cong. & Ad.News, pp. 2126, 2177.[10] Under the latter provision, an objecting party must state "reasonable grounds" before obtaining a hearing. The drafters of the 1954 amendments must have been well aware that section 357(f) required the statement of reasonable grounds. We cannot believe that the omission of the word "reasonable" from section 371(e)(3) was inadvertent.[11]

---

**9.** The Senate Report on the 1954 amendments notes:

The main purpose of the bill is to facilitate the making of noncontroversial changes in food standards regulations. The bill is designed to—

(1) Simplify the procedures . . . by restricting the requirements for the formal type of hearings, as now prescribed in section 701(e) of that act, to instances where this procedure is desired by a party who would be adversely affected if the regulation, as proposed, were to be effective . . . .

S.Rep.No. 1060, 83d Cong., 2d Sess., *reprinted in* [1954] U.S.Code Cong. & Ad.News, p. 2126.

A letter from the Department of Health, Education and Welfare incorporated in the Senate Report on the 1956 amendments states:

On the narrow issues about which there is controversy, any interested person affected by a proposed regulation could, by filing a petition, initiate the formal procedure, including a public hearing, establishment of the public record on which our action would be based, and review of our action in the United States Courts of Appeals. Thus, no substantial rights of any person would be relieved of protection, while government, the public, and industry are relieved of the costs and expenditure of time in holding hearings on points about which all agree.

Letter from Secretary of Health, Education and Welfare, dated June 6, 1956, to Hon. J. Percy Priest, Chairman of the Committee on Interstate and Foreign Commerce, *incorporated in* S.Rep.No. 2752, 84th Cong., 2d Sess., *reprinted in* [1956] U.S.Code Cong. & Ad.News, pp. 4104, 4106. *See also* Hearings on H.R. 5055 before a Subcommittee of the Committee on Interstate and Foreign Commerce of the House of Representatives, 83d Cong., 1st Sess. (1953).

**10.** *See also* Forte, *supra* note 9, at 15; Markel, *Reviewing Food Standards,* 6 Food Drug Cosm. L.J. 191, 202–03 (1951).

**11.** The only element of discretion afforded the Secretary to dispose summarily of proposals to issue, amend, or repeal regulations under section 371(e) has been, since 1938, the power to

■ Our examination of the legislative history of section 371(e) convinces us that the Commission's regulations and procedures, insofar as they allow the Commission to deny a hearing when the objections adduced in good faith raise material issues that are not frivolous or inconsequential, are contrary to the statutory scheme established by Congress.

The Commission cites cases arising under other provisions of the Federal Food, Drug and Cosmetic Act to support its requirement that reasonable grounds be shown as the condition for a hearing. *See Weinberger v. Hynson, Westcott & Dunning,* 412 U.S. 609, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973) (procedure under 21 U.S.C. § 355); *Pfizer v. Richardson,* 434 F.2d 536 (2d Cir. 1970) (procedure under 21 U.S.C. § 357(f)). The procedures under those statutes require that petitioning parties proffer reliable evidence, sometimes of a type specifically prescribed by regulation, before the agency will grant a hearing.

The summary procedures elaborated by the Food and Drug Administration under 21 U.S.C. § 355 were examined by the Supreme Court in *Weinberger v. Hynson, Westcott & Dunning, supra.* The Court held that the agency could summarily withdraw its approval of a new drug application without a hearing if the manufacturer failed to show that the effectiveness of the drug could be established by substantial evidence stemming from adequate and well-controlled investigations. 412 U.S. at 621, 93 S.Ct. 2469. Unlike section 355, nothing contained in the language or the legislative history of section 371(e) can be interpreted to impose such conditions on a party seeking a hearing under that section.

Neither does section 357(f) provide authority for the agency's position. That statute might be interpreted as permitting the agency to require a hearing applicant to make reference to adequate and well-controlled investigations. *See Pfizer v. Richardson,* 434 F.2d at 545. Such authority may be derived from the language of section 357(f), which requires hearing applicants to show "reasonable grounds" for their objections. A similar interpretation of the controlling statute in this case is unwarranted.

■ We hold that section 371(e) leaves the agency no discretion to rule on the quality and validity of the objections prior to the formal hearing, so long as they are made in good faith and draw in question in a material way the underpinnings of the regulation at issue. It is inconsistent with the statutory scheme to require the objecting party to allege anything more.

The Commission's summary procedure may be justified where, as was the case in *Dyestuffs,* the issues raised by the objecting party have been authoritatively determined to be legally irrelevant. But a different case is presented where, merely because the agency has concluded that the scientific evidence is adequate to support its order, a hearing is denied on the assumption that it would serve no purpose. This is not a case where the objections simply raise legal challenges to well-settled principles of law. Pactra's objections raise material issues that should not be dispelled at the outset without a hearing. The objections are neither frivolous nor inconsequential, and by raising the issue whether the products are hazardous within the statutory definition and whether the protection of the public could be served as well by means other than by classifying the products as banned hazardous substances, the company has expressed legitimate doubts as to the factual and legal premises of the Commission's order.[12]

dismiss at the outset those proposals by third parties which do not state "reasonable grounds." This expressed discretionary authority to refuse at the outset to entertain third party proposals serves to emphasize the absence of discretion to deny a hearing on a proposed regulation once the regulation has been published after the notice and comment stage.

12. The rule permitting the agency to abbreviate statutory hearing procedures in order to avoid performing a meaningless task, as acknowledged in *United States v. Storer Broadcasting*

Had Congress so permitted, informal rule making, without the necessity of findings on a record after hearings, might have been an appropriate, perhaps even a preferred, procedure for the agency to follow in the instant case.[13] However, Congress has chosen otherwise. Further, the Supreme Court has noted that section 371(e) is one of those statutes, few in number, that does require rule-making hearings to be on the record in accordance with the Administrative Procedure Act, 5 U.S.C. §§ 556 and 557. *United States v. Florida East Coast Railway Co.*, 410 U.S. 224, 237–38, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973) (dictum). *See also National Nutritional Association v. FDA*, 504 F.2d 761, 792 (2d Cir. 1974).

■ The procedural prerequisites to rule making under section 371(e) serve to impose a discipline on the agency's decision-making process, forcing it to present ordered proof to support its position.[14] These procedures permit affected parties to express in a direct and participatory manner their opposition and criticism of governmental action before it becomes final. The public, and the regulated industries, as well as the agency, develop a better understanding of the problem at hand by following these procedures, and the resulting regulation may be a more refined and precise statement of agency policy. The procedural restrictions imposed on the agency by section 371(e) are admittedly severe, but they are stated with particularity in the rule-making statute, and we can find no reason to dispense with these procedures in this case. If the Commission believes that a

substance should not be used where it has been shown to be potentially carcinogenic under intensive exposure conditions, its determination deserves thorough public examination. To implement that determination the agency must therefore follow the procedures Congress has prescribed.

■ The very absence of a formal record in this case makes it difficult for us to evaluate the agency's assertion that no record is needed or that the evidence on which it relies is sufficient to support its determination. At oral argument, the agency stated that its rule is supported by all of the files in its possession. The agency may not so neatly frustrate the formal judicial review intended by Congress when it enacted the strict procedural requirements of section 371(e). In the instant case the statute specifically predicates judicial review on the existence of a formal record and further requires that that record be established by evidence adduced at a public hearing.

■ Both the failure to hold hearings and the failure to produce the formal record mandated by the statute are defects that invalidate the Commission's regulation in this case. Accordingly, the Commission's order promulgating 16 C.F.R. § 1500.-1710(a)(10) is set aside.

*Co.*, 351 U.S. 192, 205, 76 S.Ct. 763, 100 L.Ed. 1081 (1956), and *FPC v. Texaco*, 377 U.S. 33, 84 S.Ct. 1105, 12 L.Ed.2d 112 (1964), would be applicable to this case only if there existed no grounds whatsoever for disputing the premises on which the agency, on the basis of its preliminary pronouncements, appeared to rely. But the agency had the burden of making that showing, and it has not done so here.

**13.** *See, e. g., Long Island R.R. v. United States*, 318 F.Supp. 490, 495 (E.D.N.Y.1970) (per Friendly, J.); 1 K. Davis, Administrative Law Treatise § 6.06 (1958 & Supp.1976). *See generally,* Hamilton, *Procedures for the Adoption of Rules of General Applicability: The Need for Procedural Innovation in Administrative Rule-*

*making,* 60 Cal.L.Rev. 1276 (1972); Note, *The Judicial Role in Defining Procedural Requirements for Agency Rulemaking,* 87 Harv.L.Rev. 782 (1974).

**14.** Under the terms of 5 U.S.C. § 556(d), "the proponent of a rule or order has the burden of proof." While this requirement may be interpreted as allocating to the agency proposing a rule only the burden of going forward, rather than the burden of ultimate persuasion, *see Environmental Defense Fund Inc. v. EPA,* 548 F.2d 998, 1004 (D.C.Cir.1976) that burden is not met under this statute unless evidence has been presented within the context of the statutory hearing.