The **UPJOHN COMPANY**, Plaintiff,

v.

**Robert H. FINCH, Secretary of Health, Education and Welfare, and Herbert L. Ley, Jr., Commissioner of Food and Drugs, Defendants.**

Civ. A. No. 163.

United States District Court
W. D. Michigan, S. D.
July 10, 1969.

Henry Ford, Jr., Kalamazoo, Mich., Stanley L. Temko, Washington, D. C., for plaintiff.

Harold D. Beaton, U. S. Atty., Grand Rapids, Mich., William W. Goodrich, Asst. Gen. Counsel, U. S. Dept. of Health, Education & Welfare, for defendants.

Gould Fox, Kalamazoo, Mich., and Lloyd N. Cutler, Washington, D. C., amicus curiae Pharmaceutical Manufacturers Assn.

## OPINION

KENT, Chief Judge.

This action arises under the Federal Food, Drug and Cosmetic Act, 52 Stat. 1040 (1938), as amended; 21 U.S.C.A. § 301 et seq. (hereinafter the Act) and the Administrative Procedure Act, § 9, 5 U.S.C.A. § 558. The plaintiff asserts that this Court has jurisdiction of this cause pursuant to the provisions of Title 28 U.S.C.A. § 1331; 28 U.S.C.A. § 1337; 28 U.S.C.A. §§ 2201, 2202 and Section 10 of the Administrative Procedure Act, 5 U.S.C.A. §§ 701–706. Plaintiff asserts that venue is in this Court pursuant to the provisions of 28 U.S.C.A. § 1391(e) (4).

## FACTS

Plaintiff is a Delaware corporation with its principal place of business in Kalamazoo in the Western District of Michigan. The defendants are officers of the Government of the United States. Plaintiff is the manufacturer of certain antibiotic drugs, the subject of this litigation, which drugs are marketed under proprietary names. The drugs in question are referred to as "combination" drugs. Specifically, the seven products involved are:

(1) Albamycin-T Capsules, containing tetracycline hydrochloride and sodium novobiocin.

(2) Panalba Capsules, containing tetracycline phosphate complex and sodium novobiocin.

(3) Panalba Half-Strength Capsules, containing tetracycline phosphate complex and sodium novobiocin.

(4) Albamycin-T Flavored Granules for Suspension, containing tetracycline hydrochloride and calcium novobiocin.

(5) Panalba KM Flavored Granules for Suspension, containing tetracycline and calcium novobiocin.

(6) Panalba KM Drops, Flavored Granules for Suspension, containing tetracycline and calcium novobiocin.

(7) Albamycin G.U. Tablets, containing calcium novobiocin and sulfamethizole.

In 1956 the Commissioner of Foods and Drugs (hereinafter Commissioner) acting pursuant to § 507(a) of the Act, 21 U.S.C.A. § 357(a), promulgated regulations (now §§ 141(c).234 and 146(c).234 of the regulations of the Food and Drug Administration) providing that certain antibiotic drugs containing a combination of tetracycline and novobiocin could be certified as safe and effective. 21 Fed.Reg. 10373. The plaintiff's Panalba products were first approved and certified by the Food and Drug Administration as being both safe and effective in 1956, and they were put on the market in 1957.

In 1958, pursuant to § 505 of the Act, 21 U.S.C.A. § 355, the Commissioner permitted a New Drug Application to become effective for the marketing of a drug containing calcium-novobiocin and sulfamethizole (which is not an antibiotic). Subsequently, and in 1964, pursuant to amendments of § 507(a) of the Act, making all antibiotic drugs subject to certification as to safety and efficacy, the Commissioner promulgated § 148(j).4 of the Regulations of the Food and Drug Administration, 21 C.F.R. 148(j).4, providing for the certification of antibiotic drugs containing calcium/novobiocin and sulfamethizole. 29 Fed.Reg. 7655.

In 1964 the Commissioner submitted to the Drug Efficacy Study Group of the National Academy of Sciences-National Research Council a large number of previously approved drugs for evaluation as to safety and efficacy. After receipt of

the report of the NAS–NRC, and on December 24, 1968, the Commissioner acting pursuant to § 502 and § 507 of the Act, 21 U.S.C.A. §§ 352/357, published in the Federal Register a notice of his intent to initiate proceedings to amend the antibiotic regulations to delete plaintiff's tetracycline/novobiocin combination antibiotic drugs from the list of drugs acceptable for certification as to safety and efficacy. 33 Fed.Reg. 12904. The Commissioner stated that the basis for his action was a finding by the NAS–NRC that plaintiff's named products are "ineffective as a fixed combination for the indications specified in the labeling" and the Commissioner's *concurrence* "that there is a lack of *substantial evidence* that each ingredient in the above combination contributes to the claimed clinical effect." (Emphasis added). The notice of December 24, 1968, invited "all interested persons who may be adversely affected by removal of these drugs from the market to submit any pertinent data bearing on the proposal" within 30 days. At the request of the plaintiff this period was subsequently extended by the Commissioner for a period of 120 days, in a letter dated January 24, 1969. On the same day, December 24, 1968, the Commissioner, pursuant to § 502 and § 507, also published in the Federal Register a notice of his intent to initiate proceedings to delete plaintiff's combination novobiocin/sulfamethizole drug from the list of drugs acceptable for certification. 33 Fed.Reg. 19203. The stated basis for the Commissioner's action as to this drug was the same as to plaintiff's other drugs and the same extension of time to submit pertinent data was given.

On February 25, 1969, Paul A. Pumpian, Director, Office of Legislative and Governmental Services, Food and Drug Administration, Department of Health, Education and Welfare, addressed a letter to the Honorable Sam J. Ervin, Jr., United States Senate (Exhibit A to plaintiff's brief in support of the motion for temporary injunction) which read in part as follows:

"These combination antibiotic drugs are still on the market. The distributors were given the opportunity to supply evidence that the drugs are effective for the purposes for which they are labeled. *If adequate data to substantiate the effectiveness of these combinations are not forthcoming within the period of time, the distributors of the drugs will be given an opportunity for a hearing prior to any action to remove these drugs from the market.* If a hearing is held and decided in favor of the Government, the final order may be appealed to the courts. Until such time as the antibiotic regulations are amended to delete these drugs from those eligible for certification, the drugs may continue to be marketed. Withdrawal of the drugs from the market would not preclude clinical investigation of them through the investigational new drugs procedures. Based upon a demonstration of effectiveness by adequate and well-controlled studies, a drug may be returned to the market." (Emphasis added.)

On the hearing of this cause plaintiff's counsel pointed out that in March, 1969, there was submitted to the Commissioner for an approval a protocol (meaning plan) for controlling clinical studies of the drugs in question. According to counsel these have not yet been approved or disapproved subsequent to inquiry in May, 1969. In the first week of May, 1969, the Commissioner informed the plaintiff of an intent to repeal the regulations providing for certification of plaintiff's combination drugs listed above for failure to submit controlled clinical studies of the safety and efficacy of such drugs, and allowed the plaintiff two days in which to acquiesce in such order. Not having received such acquiescence on May 15, 1969, the Commissioner, pursuant to § 502 and § 507 of the Act, published in the Federal Register an order amending the regulations of the Food and Drug Administration providing for the repeal of the regulations permitting the certification of plaintiff's combina-

tion drugs listed above, revoking all certificates previously issued, and stating that no further batches would be certified. The order repealing the regulations stated that it was based upon "a lack of *substantial evidence* that the drugs will have the effectiveness they purport and are represented to have, and more particularly, that each ingredient in the above combinations contributes to the claimed clinical effect of the drugs." (Emphasis added.)

The existing outstanding certificates were revoked "on the basis of the unwarranted hazard" in the light of the drugs asserted lack of efficacy although there was no finding of an imminent hazard to health. The order stated it was to become effective 30 days after its publication "to allow time for a recall (of plaintiff's product) to be completed." 34 Fed. Reg. 7687. The order provided that objections to the order could be submitted within the 30 day period and a hearing could be requested. It went on to say that "a statement of reasonable grounds for a hearing must identify the claimed errors in the NAS–NRC evaluation and identify any adequate and well-controlled investigations on the basis of which it could reasonably be concluded that the combination drugs would have the effectiveness claimed and would be safe for their intended uses." There was no provision for a stay of the order pending a hearing on objections. 34 Fed.Reg. 7687.

On May 27, 1969, plaintiff filed in this Court a complaint for declaratory judgment and injunctive relief reciting the facts hereinbefore related and alleging that defendants "acted in excess of their authority and without observance of the procedure required by law and arbitrarily and capriciously in that the Order contravenes plaintiff's right to an evidentiary hearing prior to the removal of its products from the market." Plaintiff claims a right to an evidentiary hearing before removal of the drugs from the market based upon

(1) Sections 507(b), (f) & (h) of the Act, 21 U.S.C.A. § 357(b), (f) & (h);

(2) 5th Amendment to the United States Constitution;

(3) The regulations issued by the Commissioner on April 8, 1969. 34 Fed.Reg. 6237–9;

(4) Section 9 of the Administrative Procedure Act. 5 U.S.C.A. § 558; and

(5) Irreparable injury to the plaintiff.

In addition, plaintiff contends that the Act does not authorize the defendants to delete an antibiotic drug otherwise acceptable for certification on the ground that the drug, in the judgment of the defendants, is not *relatively* more effective than other antibiotic drugs individually or in combinations.

In the prayer for relief plaintiff requests this Court to declare the repeal of the Food and Drug Administration regulations which provide for certification of its tetracycline/novobiocin and novobiocin/sulfamethizole combination drugs, and the order revoking certifications previously issued under those regulations, to be null and void. Plaintiff asks that this Court restrain the defendants from enforcing the order repealing the regulations and require the defendants to continue to certify any batch of plaintiff's tetracycline/novobiocin or novobiocin/sulfamethizole combinations which comply with the previous regulations. Plaintiff seeks the relief in question, including the mandatory injunction, pending determination of the present controversy.

On June 11, 1969, this Court issued a Temporary Restraining Order prohibiting defendants from enforcing the above order until a hearing could be had on plaintiff's complaint. The Temporary Restraining Order was not issued until after a full conference in chambers with counsel for the plaintiff and counsel for the defendants. By stipulation of the parties the Temporary Restraining Order was continued in effect at the conclusion of the hearing pending this Court's determination of the plaintiff's right to a temporary injunction in this action.

In considering plaintiff's request for relief additional claimed facts, undetermined at this time, should be noted.

It is claimed: that plaintiff is the only manufacturer of combination tetracycline/novobiocin antibiotic and the novobiocin/sulfamethizole combination; that since the plaintiff first marketed the tetracycline/novobiocin combination, under the name Panalba, in 1957, 750 million doses have been administered to patients in the United States (Panalba is sold only in the United States); that other tetracycline/novobiocin combinations sold only in foreign countries have been widely used since first marketed in 1958; that 450 million doses of Albamycin-T have been administered to patients and 44 million doses of Albamycin G.U. have been administered to patients; that the sale of these combination drugs represents a substantial portion of the plaintiff's annual sales of pharmaceuticals.

Plaintiff asserts that for many months. it has been attempting to obtain from the defendants the names of the individual members of the NAS–NRC panels which made the adverse findings as to the efficacy of plaintiff's drugs in which the Commissioner concurred. Up to the present time plaintiff has been given only the names of the Chairmen of the two panels involved, despite the fact that the evaluation reports as to plaintiff's drugs involved in this action made an adverse determination as to the efficacy of the drugs based upon the "informed opinion of the panel," as well as a limited number of medical journal articles and other material, most of which has been in existence since prior to 1960.

Prior to the effective date of the order of May 15, 1969, plaintiff filed with the Commissioner objections to the order. Defendants claim, in addition to denial of jurisdiction and venue, that the plaintiff has not exhausted the administrative remedies. This is adequately covered on page 14 of defendants' reply brief, where it is stated: "Before granting interim relief, the agency must find that justice so requires. The Commissioner has stated to two Congressional Committees that he does not intend to grant interim relief in this case because of the unwarranted hazards in the use of the combination drug."

At the time of the hearing on plaintiff's application for temporary injunction counsel for the Pharmaceutical Manufacturers Association, appearing amicus curiae, stated that by similar procedure the Commissioner had indicated an intention to remove all other combination antibiotic drugs from the market.

There are four principal issues to be resolved by this Court:

I.   Does a District Court have jurisdiction over the instant action and the parties?

II.  Is the venue for this action properly in the Western District of Michigan?

III. Is the action timely for consideration by a District Court? and

IV.  Assuming that venue and jurisdiction are proper, that the action is timely filed, what relief may this Court grant to the plaintiff, if the plaintiff is entitled to relief?

### JURISDICTION

Defendants contend that under § 507 (f) of the Act, 21 U.S.C.A. § 357(f), the review provisions of § 701(f), 21 U.S.C. A. § 371(f), are applicable, and that under the provisions of § 701(f) a District Court is without jurisdiction to review an order of the Food and Drug Administration. Defendants do not seriously deny that the plaintiff will suffer irreparable damage by enforcement of the Commissioner's order of May 15, 1969.

Admittedly, all the drugs involved are antibiotic drugs within the meaning of the Act and are subject to the provisions of § 507(f), which provides in part:

"(f) Any interested person may file with the Secretary [Secretary of Health, Education and Welfare] a petition proposing the issuance, amendment, or repeal of any regulation contemplated by this section. The petition shall set forth the proposal in gen-

eral terms and shall state reasonable grounds therefor. The Secretary shall give public notice of the proposal and an opportunity for all interested persons to present their views thereon, orally or in writing, and as soon as practicable thereafter shall make public his action upon such proposal. At any time prior to the thirtieth day after such action is made public any interested person may file objections to such action, specifying with particularity the changes desired, stating reasonable grounds therefor, and requesting a public hearing upon such objections. The Secretary shall thereupon, after due notice, hold such public hearing. As soon as practicable *after completion of the hearing, the Secretary shall by order make public his action on such objections*. The Secretary shall base his order only on substantial evidence of record at the hearing and shall set forth as part of the order detailed findings of fact on which the order is based. *The order shall be subject to the provisions of section 701(f) and (g) of this Title."* (Emphasis added.)

The pertinent parts of Section 701(f) are:

"(f) (1) In a case of actual controversy as to the validity of any order under subsection (e) of this section, any person who will be adversely affected by such order if placed in effect may at any time prior to the ninetieth day after such order is issued file a petition with the United States court of appeal for the circuit wherein such person resides or has his principal place of business, for a judicial review of such order * * *.

"(6) *The remedies provided for in this subsection shall be in addition to and not in substitution for any other remedies provided by law."* (Emphasis added.)

The purpose of 701(f) was discussed by the House Committee Report as follows:

"Section 507(f) is designed to insure the right of protest to all interested parties who have reasonable grounds for dissatisfaction with the Administrator's action with respect to regulations and to provide for court review of the validity of the Administrator's action in the event that a solution satisfactory to all concerned is not reached.

"Any interested person may petition the Administrator to adopt a proposal for the issuance, amendment, or repeal of a regulation. The proposal may be set forth in general terms; reasonable grounds for it must be stated. The Administrator is required to give public notice of the proposal and to afford an opportunity for all interested persons to express their views. He is then required to make public his action on the proposal. Within 30 days thereafter (whether or not the action has already become effective) any interested person may file objections to the action, specifying with particularity the changes desired, stating reasonable grounds therefor, and requesting a public hearing upon his objections. *The Administrator is then required, after due notice, to hold a public hearing on the objections. As soon as practicable after the hearing the Administrator is required to make findings of fact and publish an order based thereon. Such orders, in cases of actual controversy as to their validity, are subject to review by the Circuit Courts of Appeals under the provisions of Section 701(f) of the Act.*

"In essence, section 507 authorizes the Administrator to utilize any of three techniques in promulgating regulations that deal with the certification of penicillin products. First, he may act on his own initiative or at the informal request of any interested party. It is anticipated that most of the regulations will be promulgated through this method in close consultation with interested persons. Second, he is required to act on the basis of a formal petition and after informal hearing. *Third; if there is objection within 30 days to his action on the petition, he is required to act after a formal public*

*hearing.* The statutory review provisions of section 701(f) are intended to be applicable only with respect to the third type of action." H.R.Rep. No. 702. 79th Cong., 1st Sess., pgs. 4, 5 (1945). (Emphasis added.)

■ Plaintiff has filed objections to the order of May 15, 1969, but the Commissioner has taken no action in regard to these objections. A strict reading of § 507(f) compels the conclusion that the review provisions are applicable only to an order which is made public after completion of the hearing contemplated by § 507(f). This conclusion is compelled by the fact that the first occurrence of the word "order" in § 507(f) is in relation to the announcement of the conclusions reached by the Secretary *after* completion of the hearing contemplated by that Section. In making the provisions of § 701(f) applicable to § 507 it is stated: "The order shall be subject to the provisions of §§ 571(f) & (g) of this title." Consequently, until an "order", *as contemplated by § 507(f)* is issued, the provisions of § 701(f) do not apply and the plaintiff does not have recourse to the appropriate Court of Appeals under the provisions of § 701(f).

This does not prevent a District Court from taking jurisdiction of a case if otherwise appropriate. The House Committee Report states:

"[701(f) (6)] Saved as a method to review a regulation placed in effect by the Secretary whatever rights exist to initiate a historical proceeding in equity to enjoin the enforcement of the regulation and whatever rights exist to initiate a declaratory judgment proceedings." H.R.Rep.No. 2139, 75th Cong., 3rd Sess., pg. 11 (1938).

See also Abbott Laboratories v. Gardner, 387 U.S. 136, 141–146, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), wherein the Supreme Court said:

" * * * indeed, *a study of the legislative history shows rather conclusively that the specific review provisions were designed to give an additional remedy and not to cut down more traditional channels of review.* At the time the Food, Drug and Cosmetic Act was under consideration, in the late 1930's, the Administrative Procedure Act had not yet been enacted, the Declaratory Judgment Act was in its infancy, and the scope of judicial review of administrative decisions under the equity power was unclear. It was these factors that led to the form the statute ultimately took. There is no evidence at all that members of Congress meant to preclude traditional avenues of judicial relief. Indeed, throughout the consideration of the various bills submitted to deal with this issue, it was recognized that 'There is always an appropriate remedy in equity in cases where an administrative officer has exceeded his authority and there is no adequate remedy of law, * * * [and that] protection is given by the so-called Declaratory Judgments Act * * *' H.R. Rep. No. 2755, 74th Cong., 2d Sess., 8. It was specifically brought to the attention of Congress that such methods had in fact been used in the food and drug area, and the Department of Justice, in opposing the enactment of the special-review procedures of § 701, submitted a memorandum which was read on the floor of the House stating: 'As a matter of fact, the entire subsection is really unnecessary, because even without any express provision in the bill for court review, *any citizen aggrieved by any order of the Secretary, who contends that the order is invalid, may test the legality of the order by bringing an injunction suit against the Secretary or the head of the Bureau, under the general equity powers of the court.'* 83 Cong.Rec. 7892 (1938)." pgs. 142–143, 87 S.Ct. pg. 1512. (Emphasis added.)

The Supreme Court of the United States has stated that where great and irreparable damage will be done and important rights are being asserted relief in equity may be sought in the District Court. In Utah Fuel Co. v. National Bituminous Coal Commission, 306 U.S. 56,

59 S.Ct. 409, 83 L.Ed. 483 (1939), the Court said in this connection:

"The jurisdiction of a District Court is to be 'determined by the allegations of the bill, and usually if the bill or declaration makes a claim that if well founded is within the jurisdiction of the Court it is within that jurisdiction whether well founded or not.' (authority cited)." pg. 60, 59 S.Ct. pg. 411.

Abbott Laboratories v. Gardner, supra, presented similar issues to the United States Supreme Court. The Court held that pre-enforcement judicial review of regulations which were not otherwise subject to review pursuant to the provisions of the Food and Drug Act prior to enforcement is not prohibited by § 701 (f) of the Act and may be sought in the District Court. In this connection the Court said:

" * * * The Government relies on no explicit statutory authority for its argument that pre-enforcement review is unavailable, but insists instead that because the statute includes a specific procedure for such review of certain enumerated kinds of regulations, not encompassing those of the kind involved here, other types were necessarily meant to be excluded from any pre-enforcement review. The issue, however, is not so readily resolved * * *." 387 U.S. pg. 141, 87 S.Ct. pg. 1511.

The Court further said at page 144, 87 S.Ct. at page 1513:

"Against this background we think it quite apparent that the special-review procedures provided in § 701(f), applying to regulations embodying technical factual determinations, were simply intended to assure adequate judicial review of such agency decisions, and that their enactment does not manifest a congressional purpose to eliminate judicial review of other kinds of agency action."

and in the above quotation cited with approval the language of the Court of Appeals for the Second Circuit in Toilet Goods Association v. Gardner, 360 F.2d 677, 683 (C.A. 2, 1966).

"The agency determinations specifically reviewable under § 701(e) relate to such technical subjects as chemical properties of particular products and the formulation and application of safety standards for protecting public health; Congress naturally did not wish courts to consider such matters without the benefit of the agency's views *after* an evidentiary hearing before it." (Emphasis added.)

The Supreme Court further said in regard to § 701(f) (6) and its effect upon pre-enforcement judicial review:

"We prefer to take the saving clause at its face value, and to read it in harmony with the policy favoring judicial review expressed in the Administrative Procedure Act and this Court's decisions." 387 U.S. pg. 146, 87 S.Ct. pg. 1514.

In *Abbott Laboratories,* supra, the United States Supreme Court concluded that where agency action was final and no pre-enforcement judicial review was provided within the Act the District Courts could exercise their jurisdiction to hear actions under the Declaratory Judgment Act. The Court said at page 143, 87 S.Ct. at page 1512:

"The provisions now embodied in a modified form in § 701(f) were supported by those who *feared the life- and- death power given by the Act to the executive officials,* a fear voiced by many members of Congress. The supporters of the special-review section sought to include it in the Act primarily as a method of reviewing agency *factual* determinations." (Emphasis added.)

The controversy in this case is not unlike that considered by the United States Supreme Court in *Abbott.* As in *Abbott* the drug manufacturer (Upjohn) is faced with enforcement of an agency order before it has an effective opportunity to seek to have the order reviewed pursuant to the provisions of the Act. As in *Abbott* there is here a serious question as to whether the defendants are attempting to exceed the powers granted by Congress

to the substantial detriment of the plaintiff. In the instant case the legal issues are in this respect two-fold. First, is the defendants interpretation of the information necessary to establish "reasonable grounds" for a hearing under § 507(f) the proper interpretation; Second, is the assertion by the defendants that the board order here involved may be enforced prior to the time when a determination is made as to whether "reasonable grounds" exist for a public hearing justified under the terms of § 507(f). In considering these issues this Court is concerned only with their legal implications.

After considering the pleadings, the briefs and the arguments of counsel, it is this Court's conclusion that the instant action is a proper case for judicial review in its present posture. It appears obvious to this Court that the defendants seek to equate "reasonable grounds" with "substantial evidence" under the provisions of § 507(f), which presents significant issues of statutory interpretation. In addition the defendants have interpreted § 507(f) as permitting them to enter an order requiring the removal from the marketplace of antibiotic drugs prior to a determination as to whether a hearing need be held with regard to such order of removal when such drugs have for approximately 12 years been certified by the Food and Drug Administration as safe and efficacious and proper to be marketed. This involves a further significant statutory question since such action is not specifically provided for under the provisions of § 507(f). Furthermore, defendants' interpretations are being imposed upon plaintiff in such a manner as to subject the plaintiff to potential irreparable damage, thus presenting a case which is "ripe" for the exercise of the equity powers of this Court.

Defendants rely upon Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638 (1938), which this Court finds unpersuasive. In *Myers* plaintiff was attempting to enjoin an administrative hearing, whereas here the plaintiff is attempting to enjoin enforcement of an administrative order until an administrative hearing has been provided. Pharmaceutical Manufacturers Association v. Gardner, 127 U.S.App.D.C. 103, 381 F.2d 271 (1967), is equally unpersuasive. In that case the action of the Commissioner was subject to an automatic stay of execution as provided in § 701(e) of the Act. Ewing v. Mytinger & Casselberry, 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950), is inapplicable because the Supreme Court declared in that case that the District Court had no jurisdiction as to an administrative determination *of probable cause*, a factual issue.

This Court is satisfied that it has jurisdiction under the Act and under The Declaratory Judgment Act. 28 U.S.C.A. § 2201 et seq. This Court is not concerned with any factual issues. The Court is satisfied that it should be concerned with and take jurisdiction over only the legal issues involved at a stage in the proceedings when the plaintiff can have no opportunity for effective review of the administrative action prior to enforcement which will cause irreparable damage to the plaintiff.

### VENUE

Defendants contend that if the District Courts of the United States have jurisdiction over actions such as the one with which we are here concerned this Court lacks venue under the provisions of 28 U.S.C.A. § 1391. It is conceded by all parties that there is a split of authority among the cases in regard to this question. This split of authority was specifically recognized by the Supreme Court of the United States in Abbott Laboratories v. Gardner, supra (387 U.S. 136, 156, 157, note 20, 87 S.Ct. 1507, 18 L.Ed.2d 681). The Supreme Court specifically refused to rule upon the interpretation to be given § 1391(c) and § 1391(e), and in the remand of the case directed the Third Circuit Court of Appeals to consider the issue in depth.

There can be no question, and it is conceded by the parties, that venue in this case is controlled by the provisions

of 28 U.S.C.A. § 1391(e), which provides:

"(e) A civil *action in which each de-fendant* is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States, may, except as otherwise provided by law, be brought in *any* judicial district in which: (1) a defendant in action resides, or (2) the cause of action arose, or (3) any real property involved in the action is situated, or (4) *the plaintiff resides if no real property is involved in the action.*" (Emphasis added.)

Obviously § 1391(e) (4) is the controlling provision.

The conflict amongst the courts and the commentators arises out of the meaning of the word "resides" when applied to a corporate plaintiff. Some cases, including the only two Courts of Appeal which have ruled on the issue, and some commentators, take the position that under the cited statute a corporate plaintiff's "residence" is its place of incorporation only. Other cases and other commentators take the position that the changes in the venue statute indicate a Congressional desire to expand venue in cases involving corporate parties, and that the provisions of § 1391(c), insofar as the definition of residence therein contained is concerned, are applicable to corporate plaintiffs in § 1391(e) (4) cases. Section 1391(c) provides:

"(c) A corporation may be sued in any judicial district in which it is incorporated or licensed to do business or is doing business, and such judicial district shall be regarded as the residence of such corporation for venue purposes."

The comment in Moore's Federal Practice in regard to the status of corporate residence for venue purposes prior to the enactment of § 1391(c) is as follows:

"For venue purposes, prior to the Judicial Code of 1948, a corporation was a resident of the state in which it was incorporated. This rule was adopted at the beginning of the 19th Century when corporate entities were beginning their great growth in this country. Despite temporary inroads enlarging the suability of corporations made by the Judiciary Act of 1875 and the later waiver doctrine of *Neirbo* [Neirbo Co. v. Bethlehem Shipbuilding Corp., 308 U.S. 165 [60 S.Ct. 153, 84 L.Ed. 167] (1939)] the rule as to corporate residency continued with vigor until 1948, when 28 U.S.C. § 1391(c) was adopted. Even on the eve of adoption of 28 U.S.C. § 1391(c) the Supreme Court reaffirmed the prior rule 'that the "residence" of a corporation, within the meaning of the venue statutes, is only in "the State and district in which it has been incorporated." * * * For almost sixty years, in an unbroken line of decisions, this Court has applied the same construction." 1 Moore's Fed.Prac. § 0.142[5.-3] pgs. 1490-1491

It is clear that there was a radical change in the law as to corporate residence for venue purposes when § 1391(c) was enacted. In supporting the position that the law was changed only as to corporate defendants Moore's says:

"The cases are in conflict as to whether § 1391(c) applies to a corporate plaintiff, or is limited to a corporate defendant. A great many courts which have considered the subject have held § 1391(c) equally applicable to corporate plaintiffs on the theory that half the statute is superfluous without such an interpretation. This theory is stated in Southern Paperboard Corp. v. United States, as follows:

'The statute first gives permission to sue a corporation in any district where it is incorporated or licensed or doing business. It then declares that such district shall be regarded as its residence. No one has suggested any reason for that declaration unless it were to give permission to the corporation to sue others in such district in addition to the previously given permission given

to others to sue the corporation in any such district.' [127 F.Supp. 649, 650 (S.D., N.Y., 1955]

Under the *contra* view that § 1391(c) is not applicable to corporate plaintiffs, the residence of the plaintiff corporation for venue purposes is only in the judicial district of the state where it is incorporated. But if subsection (c) is applicable to a corporate plaintiff the venue may be laid in any district of the state where plaintiff is incorporated (assuming that the act of incorporation qualifies the corporation to do business throughout the state); every district in which the corporation is licensed to do business; and every district in which it does business.

"While we are sympathetic with the result reached by the courts that hold § 1391(c) applies to a corporate plaintiff, as well as to a corporate defendant, we do not believe they have correctly construed the provision. The language of the first clause of subsection (c) restricts the subsection to a corporation which 'may be sued.' And this restriction does not make superfluous the second and concluding clause that 'such judicial district [in which the corporation is incorporated or licensed to do business or is doing business] shall be regarded as the residence of such corporation for venue purposes.' This clause serves a purpose in laying venue, in a transitory action, in a defendant's district where there are ·multiple defendants residing in different districts of the same state; and also in the case where defendants reside in different divisions of the same district or different districts in the same state. And, although we do not put too much reliance on this, the Reviser's Note fails to indicate any intent to effectuate, what would have been a rather far-reaching change, as to the residency of a corporate plaintiff." 1 Moore's Fed.Prac. § 0.142[5.–3], pgs. 1501–1503.

In Robert E. Lee & Co. v. Veatch, 301 F. 2d 434, 96 A.L.R.2d 619 (C.A. 4, 1961), cert. den., 371 U.S. 813, 83 S.Ct. 23, 9 L.

Ed.2d 55 (1962), the Fourth Circuit reached the same conclusion as the Editors of Moore's Federal Practice, i. e., the definition of corporate residence contained in § 1391(c) relates solely to corporate defendants. In so holding the Court said:

"An argument that the subsection redefines corporate residence generally, is that the second clause of the subsection ('and such judicial district shall be regarded as the residence of such corporation for venue purposes') would be meaningless if not so interpreted. Indeed, Judge Ryan in Freiday v. Cowdin, 83 F.Supp. 516 (S.D.N.Y.1949), declared: '[T]o conclude otherwise one would have to attribute to Congress the anomalous intent to define the residence of corporate defendants but not that of corporate plaintiffs.' 83 F.Supp. at 518

This reasoning, however, assumes the very point to be established, namely, that Congress meant by subsection (c) to change for venue purposes the law with respect to the residence of plaintiff corporations as well as defendant corporations. No such purpose can be gathered from the legislative history, and having regard for the guidelines laid down by the Supreme Court for interpreting the Judicial Code, we think the proposition must fall. At most, the statute is ambiguous, and as stated by the Court in Fourco Glass Co. v. Transmirra Products Corp., 353 U.S. 222, 227, 77 S.Ct. 787, 791, 1 L.Ed.2d 786 (1957), '* * it will not be inferred that Congress, in revising and consolidating the laws, intended to change their effect unless such intention is clearly expressed.'

"It is urged that since the term 'such corporation' in the second clause of the subsection, as a matter of syntax, refers back to the antecedent phrase, 'A corporation may be sued,' therefore, 'such corporation' means any corporation which may be sued, i. e., is amenable to suit, not only one that is actually sued. Consequently, according to this argument, the second clause should

be read as defining the residence for venue purposes of all corporations which are amenable to legal action, whether in the particular case the corporation is made a defendant or makes itself a plaintiff. This argument is not sufficient to demonstrate a clear congressional purpose to change the prior law as to plaintiff corporations." pgs. 437–438.

To the same effect is Carter-Beveridge Drilling Co. v. Hughes, 323 F.2d 417 (C.A. 5, 1963), and Control Data Corp. v. Carolina Power & Light Co., 274 F. Supp. 336 (S.D.N.Y., 1967). It should be recognized that in *Control Data*, supra, the State of New York was *not* the *principal* place of business of the plaintiff. In the present case, though Upjohn is incorporated in the State of Delaware, it is conceded that plaintiff's principal place of business is in the Western District of Michigan.

While we recognize the persuasive arguments outlined above there is an equally or more persuasive body of case and commentator authority reaching an opposite result. On this issue Barron and Holtzoff has the following comment:

"The other problem, not yet resolved, is whether this broad definition of the residence of a corporate party applies to a corporate plaintiff. On the one hand it may be argued that unless it applies to corporate plaintiffs, the second half of the section is a nullity. Further it is claimed to be anomalous to treat a corporate defendant differently from a corporate plaintiff. This reasoning has been adopted in a substantial number of cases. The argument to the contrary is that the Revisers of the Judicial Code did not intend to broaden venue for corporate plaintiffs, and that Congress did not contemplate doing more than codifying the Neirbo rule for corporate defendants. This view also has substantial case support. * * *

"In the general cases, not governed by a special venue statute, the view that 28 U.S.C.A. § 1391(c) means what it says, and that it applies to corporate plaintiffs as well as to corporate defendants, seems preferable. It avoids treating legislative language as meaningless. And the availability of transfer pursuant to 28 U.S.C.A. § 1404(a) will prevent any abuse of this liberalized view of venue." 1 Barron and Holtzoff, Federal Prac. & Proc., § 80, pgs. 387–388.

The only case found in this Circuit which is applicable to the issue of venue with which we are here concerned is Hadden v. Barrow, Wade, Guthrie & Co., 105 F. Supp. 530 (N.D., Ohio, 1952), in which case the late Judge Freed accepted the liberal interpretation of § 1391(c), and stated as follows:

" * * * The contention * * * that Section 1391(c) is merely a codification of the doctrine announced in Neirbo Co. v. Bethlehem Shipbuilding Corp., 1939, 308 U.S. 165, 60 S.Ct. 153, 84 L.Ed. 167, is neither borne out by an analysis of the statute nor by its legislative history. The Neirbo case clarifies and restates the proposition of law first announced in Ex Parte Schollenberger, 1877, 96 U.S. 369, 24 L.Ed. 853, that the designation of an agent for service of process by a corporation in a state where it is engaged in business is an effective consent to be sued in the federal courts of that state. That decision may have impelled the enactment of the section, but it clearly did not restrict itself to what was there decided.

"This Court finds itself in accord with the result reached in Freiday v. Cowdin, supra [83 F.Supp. 516 (D.C., S.D.N.Y., 1949)]. It would be purposeless to engage in a lengthy discussion of semantics or to belabor unreasonably the meaning of words. It is sufficient to say that, had the framers of the statute intended to confine venue to *defendant* corporations, the language 'and such judicial district shall be regarded as the residence of such corporation for venue purposes' would be meaningless and redundant in the face of the clear, expressive and unambigu-

ous wording which precedes it. If any other result was intended, the remedy lies in legislative amendment, rather than in faulty judicial construction." pg. 531.

The cases cited adequately present the arguments for and against a liberal interpretation of § 1391(c).

In addition, this Court is of the opinion that there is another factor which should be considered. Section 1391(e) was enacted in 1962, 14 years after the enactment of § 1391(c) (1948). By 1962 the conflict among the courts and commentators in regard to § 1391(c) was readily apparent. With this in mind a close scrutiny of § 1391(e) appears to this court to compel the adoption of the more liberal view applied to § 1391(c). It is to be noted that in subsection (e), before the enumeration of the circumstances under which an officer or an employee of the United States may be sued outside the District of Columbia, it is stated that such a civil action may be brought "in any judicial district in which;" and then are listed the four situations permitting the bringing of such an action. As a consequence a full reading of subsection (e) (4) with the material preceding would bring the following result: "[the action may] be brought in *any* judicial district in which: * * * the plaintiff resides if no real property is involved in the action." To this court the use of the word "any" in this context demonstrates that the Congress contemplated that a corporate plaintiff could indeed "reside" in more than one judicial district which would be impossible for an individual plaintiff. Such a reading of this subsection would be in conformity with a liberal reading of subsection (c). The use of the word "any" in subsection (e) does not appear to have been necessary because alternative places for initiation of such a suit were listed thereafter. If the Congress had wished to avoid an interpretation of the subsection as herein suggested it could have readily used the word "the" instead of the word "any".

In conclusion, after a thorough review of the cases and comments for and against a liberal interpretation of § 1391 (e) in the light of § 1391(c), this Court is of the opinion that it was the intent of the Congress to permit the bringing of actions against Government officers, employees and agencies in the place of "residence" of the plaintiff, be it an individual or a corporation. To hold otherwise would create a paradoxical interpretation of § 1391(c) which would result in having corporate residence mean one thing to a corporate plaintiff and something entirely different to a corporate defendant. Nothing has been brought to the attention of this Court which would suggest that the Congress intended such a result. Adherence to the liberal interpretation of subsection (c) seems especially appropriate to this Court in light of the fact that the legislative history demonstrates that the principal reason for the enactment of § 1391(e) was to expand upon the number of judicial districts in which suit against the Government or officers thereof could be heard and relieve the burden previously imposed upon the courts of the District of Columbia. The Court takes judicial knowledge of the fact that many corporations, large and small, are incorporated in the State of Delaware and have no other relationship to such state. To move the tremendous volume of suits against the Government and its officers from the District of Columbia to the District of Delaware does not appear to have been the intent of the Congress.

For the reasons herein stated this Court concludes that venue in this case is properly in this District.

## TIMELINESS OF ACTION

Defendants contend that any judicial review is premature for the reason that the Commissioner has not yet made a determination as to whether Upjohn is entitled to a hearing pursuant to § 507 (f), based upon the objections filed by Upjohn on June 14, 1969, to the Commissioner's order of May 15, 1969.

The Administrative Procedure Act, 5 U.S.C.A. § 701 et seq., which the Supreme Court of the United States declared applicable to the Food and Drug Act in Abbott Laboratories v. Gardner, supra, provides in part:

"Agency action made reviewable by statute and *final agency action for which there is no other adequate remedy in a court* are subject to judicial review. * * *" 5 U.S.C.A. § 704. (Emphasis added.)

Before this Court can give any consideration to the action taken by the Commissioner herein, two determinations must be made: (1) whether the May 15 order is a "final agency action," and (2) whether there is another adequate remedy in the District Court or in the Court of Appeals. The second question may be disposed of summarily.

This Court has already determined that § 701(f) of the Food and Drug Act is not yet applicable to the instant controversy. Therefore the statutory judicial review provisions of the Act cannot be invoked at this time, which leaves Upjohn without any adequate remedy in any court except as it may be obtained in this Court.

This leaves for determination only the issue as to whether the May 15 order of the Commissioner constitutes a "final agency action." This Court is satisfied that the action of the Commissioner is "final agency action." The May 15 order cannot be characterized as other than a "final order" in the light of the regulations promulgated on April 8, 1969, 34 Fed.Reg. 6238, which provides in part:

"* * * If the Commissioner finds that there are unresolved significant points of controversy, or that the procedure specified in Section 507(f) is required by Section 507(h), he may publish a *final order* with opportunity to file objections to such action and to request a public hearing upon such objections in accord with the provisions of Section 507(f) of the act * * *" 21 C.F.R. § 146.1(d). (Emphasis added.)

In addition the defendants have argued in their briefs and in the hearing before this Court that the May 15 order goes into effect automatically at the conclusion of the 30 day period contemplated by § 507(f) of the Act and take the position that Upjohn is not entitled to an automatic hearing on its objections to the order upon the filing of such objections. Under such circumstances it is impossible to view the May 15 order as anything but "final agency action." To hold otherwise would be to ignore the pragmatic approach used in determining the existence of the "finality" element in administrative actions. Abbott Laboratories v. Gardner, supra.

It should also be noted that the present controversy meets the test as one which is "ripe" for judicial review as that term was discussed by the Supreme Court in Toilet Goods Association v. Gardner, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967), wherein the Court said:

"In determining whether a challenge to an administrative regulation is ripe for review a twofold inquiry must be made: first to determine whether the issues tendered are appropriate for judicial resolution, and second to assess the hardship to the parties if judicial relief is denied at that stage." pg. 162, 87 S.Ct. pg. 1523

This Court has already pointed out that in this case the Court is concerned solely with the interpretation of the statutory language of the Food and Drug Act and the equity function of this Court within the Act. This Court is not concerned with consideration of the factual merits of the positions taken by the respective parties relative to the drugs in question or any order which may ultimately be issued by the Commissioner relative to such drugs after a proper determination of whether "there are unresolved significant points of controversy," or whether there are "reasonable grounds" for a public hearing in regard to the Commissioner's order. Thus it is clear that the issues being considered herein are "ripe" for judicial resolution. It is equally

clear that Upjohn can obtain effective relief from the Commissioner's order only in this Court, if Upjohn is entitled to such relief. Delay in the determination of the issues herein involved would, in practical terms, allow the Commissioner to effectively remove Panalba, Albmycin-T, and Albamycin G.U. from the market, to the irreparable damage to Upjohn, before there is a determination that the Commissioner's interpretation of the pertinent provisions of the Act is proper in the light of the facts which may be adduced during an evidentiary hearing.

Defendants contention that Pharmaceutical Manufacturers Association v. Gardner, 127 U.S.App.D.C. 103, 381 F. 2d 271 (1967) is controlling herein lacks merit because that case is clearly distinguishable on its facts. Affirming the District Court's declaration that the Pharmaceutical Manufacturers Association was premature in seeking judicial relief by contesting a regulation promulgated by the Commissioner, the Court of Appeals for the District of Columbia emphasized the fact that the administrative review provisions of § 701 (e) of the Act were applicable and the enforcement of the regulation being contested was automatically stayed under that section until a hearing could be held on the Association's objections. Thus, the Association would suffer no irreparable damage and no hardship which would justify judicial relief.

In the present case the Commissioner's action does not come within the purview of § 701(e) and there has been no stay in the enforcement of the order by the Commissioner. Indeed, the Commissioner contends that Upjohn is not entitled to a stay under the statute and as previously set forth has stated in his reply brief that he does not intend to grant any interim relief. Consequently there is in the instant case an obvious threat of hardship and irreparable damage facing Upjohn if judicial relief is denied at this stage.

For the reasons stated this Court is satisfied that there has been "final agency action for which there is no other adequate remedy in a court" and that the controversy is "ripe" for judicial review at this time. 5 U.S.C.A. § 704. Abbott Laboratories v. Gardner, supra.

### RELIEF

In the determination of whether Upjohn is entitled to any relief under the statutes or to relief under the general equity powers of this Court the Court must resolve certain basic questions.

First, is Upjohn entitled to an evidentiary hearing as a matter of right on its objections to the order of the Commissioner? Second, under the provisions of § 507(f) of the Act must the order of the Commissioner be stayed pending the hearing contemplated under § 507(f), assuming that such a hearing is held? Third, under the general equity powers of the Court should Upjohn be granted a stay of enforcement of the May 15 order pending a determination of whether reasonable grounds for an evidentiary hearing have been submitted? The issues to be resolved are matters of first impression in the Courts of the United States.

■ In providing for an evidentiary hearing § 507(f) states:

"* * * At any time prior to the thirtieth day after such action is made public any interested person may file objections to such action, specifying with particularity the changes desired, stating *reasonable grounds* therefor, and requesting a public hearing upon such objections. The Secretary shall thereupon, after due notice, hold such public hearing. * * *" 21 U.S.C.A. § 357(f). (Emphasis added).

The purpose of this provision was discussed in the Committee Report to the House of Representatives, the pertinent part of which is as follows:

"*Section 507(f) is designed to insure the right of protest to all interested parties who have reasonable grounds for dissatisfaction with the Administrator's action with respect to regulations* and to provide for court review of the validity of the Administrator's

action in the event that a solution satisfactory to all concerned is not reached.

"Any interested person may petition the Administrator to adopt a proposal for the issuance, amendment, or repeal of a regulation. The proposal may be set forth in general terms; reasonable grounds for it must be stated. The Administrator is required to give public notice of the proposal and to afford an opportunity for all interested persons to express their views. He is then required to make public his action on the proposal. Within 30 days thereafter (whether or not the action has already become effective) *any interested person may file objections to the action, specifying with particularity the changes desired, stating reasonable grounds therefor, and requesting a public hearing upon his objections. The Administrator is then required, after due notice, to hold a public hearing on the objections. * * *"* H.R. Rep. 702, 79th Cong., 1st Sess., P. 4 (1945). (Emphasis added.)

A careful consideration of § 507(f) and the Committee Report interpreting that section forces this Court to the conclusion that a party objecting to the Commissioner's action, in promulgating a regulation, *is not* entitled to a hearing on the objections *as a matter of right,* but rather is entitled to a hearing when "reasonable grounds" for such hearing have been stated. A contrary holding would be in conflict with the plain intention of the Congress.

█ In this case Upjohn contends that objections, which it has filed, have in fact given the Commissioner "reasonable grounds" which would require a hearing as to the propriety of the Commissioner's regulation revoking the certification of and requiring the removal from the marketplace of Panalba, Albamycin-T and Albamycin G.U. This may well be the case but it is not for this Court to make the final determination as to whether the objections furnish "reasonable grounds" and the Court, therefore, refuses to make

a determination of Upjohn's contention in this respect. The Court is satisfied that the statute contemplates that it is for the Commissioner to make such determination, in the first instance, subject to review by the appropriate Court of Appeals.

In Dyestuffs and Chemicals, Inc. v. Flemming, 271 F.2d 281 (C.A. 8, 1959), cert. den. 362 U.S. 911, 80 S.Ct. 681, 4 L.Ed.2d 619 (1960), the Court of Appeals for the Eighth Circuit interpreted § 701 (e) of the Act in part as follows:

"* * * It is only after filing objections and '* * * stating the grounds therefor, and requesting a public hearing upon such objections * * *' that an interested party is entitled to a hearing. The hearing is solely for the purpose of receiving evidence 'relevant and material to the issues raised by such objections.' *Certainly, then, the objections, in order to be effective and necessitate the hearing requested, must be legally adequate so that, if true, the order complained of could not prevail. The objections must raise 'issues.' The issues must be material to the question involved; that is, the legality of the order attacked. They may not be frivolous or inconsequential. Where the objections stated and the issues raised thereby are, even if true, legally insufficient, their effect is a nullity and no objections have been stated.* Congress did not intend the governmental agencies created by it to perform useless or unfruitful tasks. *If it is perfectly clear that petitioner's appeal for a hearing contains nothing material and the objections stated do not abrogate the legality of the order attacked, no hearing is required by law."* pg. 286 (Emphasis added.)

At the time of the hearing of this case it was conceded by counsel for the plaintiff that objections which were insufficient legally could not furnish "reasonable grounds" for a hearing. This was the conclusion reached by the Eighth Circuit in *Dyestuffs.*

In this case, however, it is the contention of the plaintiff that the position of the Commissioner is not that plaintiff's products lack efficacy and admittedly there has been no determination that the plaintiff's products constitute "an iminent hazard to public health," rather it would appear from the arguments of counsel for all parties that the determination of the Commissioner relates to the relative efficacy of "combination drugs" as opposed to the efficacy of the components of the combination drugs prescribed separately.

It appears to this Court from a reading of the briefs and pleadings that the position taken by the plaintiff has considerable merit. If such is the case then Upjohn should be furnished an opportunity to produce "substantial evidence" at a hearing on its objections. To any Court of law it would seem to be unfair to require Upjohn to submit *all* of its proofs by means of affidavits and the citations of various medical articles since many years of experience has demonstrated to all trial judges that the testimony of witnesses may serve the important purpose of casting revealing light upon written material. As stated by the Court of Appeals for this Circuit in quoting from Stevens v. Howard D. Johnson Co., 4 Cir., 181 F.2d 390, 394:

> "It must not be forgotten that, in actions at law, trial by jury of disputed questions of fact is guaranteed by the Constitution, and that even questions of law arising in a case involving questions of fact can be more satisfactorily decided when the facts are fully before the court than is possible upon pleadings and affidavits." Knapp v. Kinsey, 249 F.2d 797, 802 (C.A. 6, 1957), cert. den. 356 U.S. 936, 78 S.Ct. 778, 2 L.Ed. 2d 812 (1958).

To this Court, unskilled in chemistry or medicine, it would appear that Upjohn's position, supported by affidavits and articles in medical journals, should present to the Commissioner an issue as to the methods and materials used by the anonymous NAS–NRC panels in their determinations as to the efficacy of the plaintiff's products. We recognize, however, as previously stated, that the determination of "reasonable grounds" for a hearing is one to be made by the Commissioner.

Upjohn contends that if a hearing is held in regard to its objections then it should be entitled to a stay of the execution of the Commissioner's order until after the Commissioner has announced the action which he will take on the basis of the results of the evidentiary hearing. In considering this contention we must compare the Administrative Review Procedure provided in § 507(f) of the Act with that contained in § 701(e) of the Act. Section 507(f) sets forth in part:

> "* * * At any time prior to the thirtieth day after such action is made public any interested person may file objections to such action, specifying with particularity the changes desired, stating reasonable grounds therefor, and requesting a public hearing upon such objections. The Secretary shall thereupon, after due notice, hold such public hearing. As soon as practicable after completion of the hearing, the Secretary shall by order make public his action on such objections. The Secretary shall base his order only on substantial evidence of record at the hearing and shall set forth as part of the order detailed findings of fact on which the order is based. The order shall be subject to the provisions of section 701(f) and (g)." 21 U.S.C.A. § 357(f).

Under the general administrative provisions (Chapter VII) of the Act which applies to actions by the Commissioner pursuant to other sections of the Act but not to actions under § 507, it is provided in § 701(e) (2):

> "On or before the thirtieth day after the date on which an order entered under paragraph (1) is made public, any person who will be adversely affected by such order if placed in effect may file objections thereto with the Secretary, specifying with particularity

the provisions of the order deemed objectionable, stating the grounds therefor, and requesting a public hearing upon such objections. *Until final action upon such objections is taken by the Secretary under paragraph (3) of this subsection, the filing of such objections shall operate to stay the effectiveness of those provisions of the order to which the objections are made.* * * *" 21 U.S.C.A. § 371(e) (2). (Emphasis added.)

The legislative history of § 507(f) satisfies this Court that Congress did not intend the automatic stay of § 701(e) (2) to be applicable to action taken by the Commissioner under § 507(f). The Committee Report of the House of Representatives states in this connection:

" * * * Within 30 days thereafter *(whether or not the action has already become effective)* any interested person may file objections to the action, specifying with particularity the changes desired, stating reasonable grounds therefor, and requesting a public hearing upon his objections. The Administrator is then required, after due notice, to hold a public hearing on the objections. As soon as practicable after the hearing the Administrator is required to make findings of fact and publish an order based thereon * * *" H.R.Rep. 702, 79th Cong., 1st Sess., p. 4 (1945). (Emphasis added.)

It appears from the Committee report that it was intended that the Commissioner's order *might* go into effect prior to a hearing on objections filed by persons affected by the order.

■ Upjohn contends that the regulations promulgated by the Commissioner on April 8, 1969, compel a contrary conclusion. It is true that § 146.1(c), 21 C.F.R § 146.1(c) is clearly directed toward § 146.1(b), 21 C.F.R. § 146.1(b), the provision which deals with orders issued by the Commissioner where there is either an imminent hazard to public health or no significant point of controversy at all. Section 146.1(c) specifically provides that there shall be no stay in the execution of the order, whereas § 146.1 (d), which deals with orders issued where there are unresolved controversial issues, such as in this case, does not specifically provide that there shall be no stay in the execution of such order. While there is an apparent conflict it appears to this Court that § 146.1(d) does not require that there shall be such a stay in enforcement. Thus, this Court is satisfied that a stay of enforcement is not mandatory under the statutory scheme applicable to these proceedings. It should be noted in passing that while Congress made §§ 701 (f) and (g) applicable to § 507 cases it made no reference to § 701(e), whereas it specifically provided that § 701(e) should be applicable to § 506 cases (drugs containing insulin).

The fact that this Court has concluded, after full consideration of the statutes, regulations, and the legislative history, that Upjohn is not entitled to an evidentiary hearing *as a matter of right* under § 507(f), and is not entitled to a stay of execution pending such a hearing, if such hearing is held, does not compel the conclusion that Upjohn is not entitled to some relief. Rather, the principles of equity, the Administrative Procedure Act, 5 U.S.C.A. §§ 701–706, and the Declaratory Judgment Act, 28 U.S.C.A. § 2201, may be invoked herein. Abbott Laboratories v. Gardner, supra.

As previously noted an aggrieved party must file objections to the Commissioner's order stating "reasonable grounds" in support of such objections. In the order with which we are here concerned the Commissioner stated that such "reasonable grounds" must include certain specific points.

" * * * A statement of reasonable grounds for a hearing must identify the claimed errors in the NAS–NRC evaluation and identify any adequate and well-controlled investigations on the basis of which it could reasonably be concluded that the combination drug would have the effectiveness claimed and would be safe for their intended*

uses." 34 Fed.Reg. 7687. (Emphasis added.)

A cursory reading of the order makes it apparent that the Commissioner placed great emphasis, if not complete reliance, upon the adverse reports issued by the NAS–NRC panels with regard to Upjohn's combination antibiotic drugs. Despite the obvious reliance upon such reports, the Commissioner has consistently refused to provide to the plaintiff the names of the men who wrote the adverse reports which formed the Commissioner's basis for the present order. The reason given for the refusal to give such names is the claimed agreement between the Commissioner (Food and Drug Administration) and the National Academy of Sciences that the names of the panel members would not be divulged to interested parties to be affected by NAS–NRC panel reports because of the fear of the possibility of attempts to use pressure tactics to influence the results of such reports. In the light of the reliance placed upon such reports by the Commissioner it appears that Upjohn has been placed in an extremely awkward position as a result of the agreement between the Commissioner and the NAS. To satisfy the Commissioner Upjohn must criticize reports and furnish "substantial evidence" to thwart the statements in such reports without any knowledge as to the background of the unknown men in the field of combination drugs and the use of such drugs, and without the slightest knowledge upon which to base an evaluation of the validity of such reports.

The situation outlined appears to this Court to be the perfect example of the "life and death power given by the Act to the executive officials" which the Supreme Court, in *Abbott, supra,* indicated caused great concern among the members of the Congress. 387 U.S. 136, 143, 87 S.Ct. 1507.

It is this Court's opinion that the Commissioner's obvious reliance upon the NAS–NRC panel reports and the requirement that Upjohn indicate specific criticism of the panel reports creates an untenable situation when the Commissioner is at the same time refusing to divulge the names of the panel members (other than the Chairmen). The position taken by the Commissioner, and the requirements made by the Commissioner of the plaintiff, do not appear to this Court to be in accord with the spirit of the Food and Drug Act review provisions, as set forth in § 507(f). To require Upjohn to make specific criticism of the elements of the reports of faceless committees, which committees base their recommendations upon the "informed opinion" of the committee members, appears to this Court to present one of the most effective means which could be outlined by the Commissioner to hamper Upjohn or any other pharmaceutical manufacturer in an endeavor to establish "reasonable grounds" for hearing on its objections to a regulation or order promulgated by the Commissioner.

The specter of the heavy bureaucratic hand is heightened considerably when all of the surrounding circumstances are fully grasped. The Commissioner and the NAS–NRC panels are not acting upon the basis of any vital newly discovered information. There has been no finding by the Commissioner that the plaintiff's drugs present an imminent hazard to the public health. In fact Panalba has been marketed since 1957 and has been legally certified by the Commissioner since 1956 *as both safe and effective.* Plaintiff contends that Panalba has been prescribed by more than 20 thousand physicians and that more than 750 million doses of this combination antibiotic drug have been prescribed. In fact all that has happened since the institution of the NAS–NRC panels in 1964 is a re-evaluation of existing data and information.

Prior to May 1, 1969, Upjohn had been lead to believe that it would be afforded an opportunity to present its evidence at a formal evidentiary hearing. On May 1, 1969, Upjohn was informed that no such hearing would be held, prior to the removal of its products from the market.

All this was done despite the fact that Upjohn had indicated a willingness to subject its combination antibiotic drugs to controlled clinical tests if afforded sufficient time and an opportunity to do so. Upjohn had submitted and requested approval of formal "protocol" in which it outlined a suggested procedure for such clinical tests. The Commissioner has not seen fit to take any action on the suggested protocol.

In determining whether all of the facts or claimed facts present a proper case for the exercise of this Court's inherent equity powers it is necessary that we consider the burden which is placed upon a party seeking injunctive relief and particularly temporary injunctive relief. In Garlock, Inc. v. United Steel Incorporated, 404 F.2d 256 (C.A. 6, 1968), the Court of Appeals for this Circuit said:

"In order to be entitled to such relief plaintiff had the burden of establishing a clear case of irreparable injury and of convincing the Court that the balance of injury favored the granting of the injunction, Set-O-Type Co. v. American Multigraph Co., 55 F.2d 800 (6th Cir. 1932). Probability of success on the trial must also be shown, H. E. Fletcher Co. v. Rock of Ages Corp., 326 F.2d 13 (2d Cir. 1963)." pg. 257

The same Court in Hamlin Testing Lab., Inc. v. United States Atomic Energy Comm., 337 F.2d 221 (C.A. 6, 1964), had the following to say:

"The major factors to be considered in passing on a motion to stay an administrative order pending judicial review have recently been enumerated in Virginia Petroleum Jobbers Ass'n v. FPC, 104 U.S.App.D.C. 106, 259 F.2d 921, 925 (1958). See also Liberty Nat'l Bank & Trust Co. of Oklahoma City v. Board of Governors, 312 F.2d 392 (C.A. 10, 1962); Associated Sec. Corp. v. SEC, 283 F.2d 773 (C.A. 10, 1960); Eastern Air Lines, Inc. v. CAB, 261 F.2d 830 (C.A. 2, 1958). *Three of the factors enumerated in Virginia Petroleum are relevant to the motion before us, first, the likelihood of petitioner prevailing on its petition for review after full hearing thereon, second, whether irreparable damage will be suffered by petitioner if a stay is now denied, and third, whether the public interest calls for our discretion to be exercised to deny the stay.*" pg. 222 (Emphasis added.)

In each of the above cases a temporary injunction was sought pending *judicial* review. In the present case a temporary injunction is sought pending the Commissioner's action upon Upjohn's objections to the Commissioner's May 15 order. This Court is satisfied that the requirements outlined by the Court of Appeals, as stated above, are applicable to the rights of the parties in this case, with the exception of the requirement that the party seeking temporary injunctive relief must demonstrate a likelihood of success on trial. Such requirement is not applicable in this case because no trial is being contemplated. Further, this Court is not satisfied that it should analogize a trial with an administrative hearing, in a situation such as this, where the Court is not and should not be concerned with the factual allegations concerning the efficacy and safety of Upjohn's combination antibiotic drugs. And to utilize such an analogy and to compel Upjohn to bear the burden of such a requirement would make it necessary for this Court to give consideration to the merits of the factual allegations of the parties.

Based upon the information received and a full consideration of the pleadings, the briefs and the arguments of counsel, it appears to this Court that Upjohn will be subjected to irreparable injury if the Commissioner's order of May 15 is permitted to go into effect at this time. This Court is further satisfied that the plaintiff Upjohn has been placed in an untenable position by the Commissioner's obvious and complete reliance upon the "informed opinion" of the unknown members of the NAS–NRC panels and their reports. The Commissioner attempts to justify this state of affairs on the basis of what is described by defense

counsel as "rational therapeutics." The Court recognizes that the basic purpose of the Food and Drug Act is the protection of the public health. Counsel for the defendants would suggest that the plaintiff was required to and should have conducted "controlled clinical tests" on a continuing basis after approval of its drug as safe and efficacious in 1956. Such is not the requirement of the statute and the Commissioner has never until after December 1968 suggested to the plaintiff that such tests should be or would be required. It should be pointed out that it appears to the complete satisfaction of this Court, based upon the statements of counsel for all parties, that the public health is in no way seriously threatened by the continued marketing of Panalba, Albamycin–T and Albamycin G.U. Indeed the Commissioner himself has, in effect, reached the same conclusion as demonstrated by his failure to declare such drugs to be an imminent hazard to the public health. The fact that for 12 years these drugs (with the exception of Albamycin G.U.) have been declared both safe and effective by the defendants and have been marketed as such and have been generally and widely prescribed by competent members of the medical profession negates the idea that the public health will be in any way jeopardized if the Court grants to the plaintiff a temporary injunction. In reaching this conclusion the Court is cognizant of the fact that the Commissioner's action is not based upon any *new evidence* regarding these drugs, their safety or their efficacy, but rather all the Commissioner's actions are based upon what can only be classified as re-evaluation of previously existing evidence.

█ This Court is, therefore, satisfied and concludes that nothing has been presented to suggest that the issuance of a temporary injunction will adversely affect the public interest. Finally, this Court is compelled to point out that after a thorough review of the legislative history of the pertinent portions of the Act the Court finds it impossible to believe Congress ever in-

tended that the drastic action here taken would be taken in the manner in which the Commissioner has proceeded. Rather the Court concludes from an examination of the legislative history that it was the intent of the Congress, in the absence of a finding of imminent hazard to the public health, that the Commissioner should proceed with all due care and caution and extend to all interested parties a full opportunity to develop and present pertinent information relative to the safety and efficacy of drugs which have been on the market for many years and have been generally and widely prescribed by the medical profession.

The plaintiff may have an injunction restraining the Commissioner from enforcing the order of May 15, 1969, until 30 days after the date on which the defendant Commissioner has taken appropriate action on the objections filed by Upjohn on June 14, 1969. Counsel will submit an appropriate decree.